[PHILADELPHIA, JANUARY 11TH, 1841.]

## HUBBERT *against* BORDEN and Another.

#### IN ERROR.

1. Parol evidence is admissible to prove that an agreement in writing not under seal, between A. and B., for the delivery of certain goods by B. to A., was in fact made by A. as the agent of C., and for his benefit.

2. An agreement was made by the defendant with T. & M., beginning as follows: "I have this day contracted with and sold to T. & M. all the starch which I may manufacture this year, or have manufactured by my agency," &c.; binding himself that the quantity to be manufactured by him during the year should not exceed 1000 barrels, "the fine at five cents, and the superfine at seven cents per pound, payable in cash on delivery," &c. The agreement further provided, that if wheat should advance so as to exceed $1 20 per bushel, a proportionable advance should be made in the pound of starch; and that if wheat should decline, a corresponding deduction should be made, &c. The defendant delivered a part of the starch, but refused to deliver more, and sold and delivered other starch of his manufacture to other persons: *Held*, 1. That an action for the recovery of damages for the breach of this contract might be maintained in the names of B. & B., for whom T. & M. were the agents, and upon whose account the contract was made. 2. That B. & B. had a right to bring the action before the expiration of the year mentioned in the contract. 3. That the judge below was right in charging the jury, that in the absence of evidence on the part of the defendant, they might assume that one thousand barrels were manufactured by the defendant; the action having been commenced about a month before the expiration of the year; and that as respected the price of wheat, the defendant having omitted to produce evidence, they might presume most strongly against him within the limits of the contract and of the testimony.

ERROR to the District Court for the City and County of Philadelphia.

Holden Borden and Tully Bowen, trading as Borden & Bowen, brought an action on the case in the court below to December Term, 1835, against John Hubbert. The declaration set forth in the first

count, that " whereas heretofore, to wit, on the 1st day of April, in the year 1835, at the county of Philadelphia aforesaid, the said plaintiffs, by their agents Thomas & Martin, at the special instance and request of the said John Hubbert, bargained with the said John, to buy of him the said John Hubbert, and the said John then and there sold to the said plaintiffs, all the starch which he the said John, might manufacture during the said year, or have manufactured by his agency, the quantity not to exceed 1000 barrels; the fine at five cents per pound, 'and the superfine at seven cents per pound, and the barrels twenty cents each; deliverable on board of vessels for Pro-, vidence, or elsewhere, free of expense; payable in cash on delivery. And in consideration that the said plaintiffs, by their said agents, at the like special instance and request, &c., had then and there undertaken and faithfully promised the said John Hubbert, to accept and receive the said starch, and pay him for the same, at the rates or prices aforesaid, he, the said John Hubbert, undertook then and there, &c. to deliver the said starch to them the said plaintiffs as aforesaid.    And although, as the said plaintiffs in fact say, the said defendant hath made, or procured to be made by his agency, during the period aforesaid, large quantities of starch, and the time for the delivery of the said starch hath elapsed, and the said plaintiffs have always been ready and willing to accept and receive the said starch, and pay for the same at the rates and prices aforesaid, to wit, at the county aforesaid, yet the said John Hubbert, not regarding his said promise and undertaking, but contriving, &c. to deceive and defraud the said plaintiffs in this behalf, did not nor would as aforesaid, deliver the said starch, or any part thereof, to the plaintiffs, at the county aforesaid, or elsewhere, but wholly neglected and refused so to do; whereby the said plaintiffs have lost and been deprived of divers great gain and profits, which might and otherwise would have accrued to them, from the delivery of the said starch to them, the said plaintiffs as aforesaid, to wit, at the county aforesaid.

2. And whereas also, afterwards, to wit, on the 1st day of April, 1835, at the county aforesaid, in consideration that the plaintiffs, at the instance and request of the said defendant, had then and there bought of the defendant all the starch which he might manufacture during said year, or have manufactured by his agency, at and for certain prices then and there agreed upon between them, he, the said defendant, then and there undertook, and then and there faithfully promised the said plaintiffs well and truly to deliver to them the said starch, whenever he the said defendant should be thereunto afterwards requested; and the said plaintiffs in fact say, that although the said defendant made or procured to be made by his agency large quantities of starch during the time aforesaid, and the said plaintiffs afterwards, to wit, on the 30th day of May and the 8th of June, in the said year, as well as on divers other occasions, at the county aforesaid, requested the defendant to deliver them the starch

so made as aforesaid,- and were then and there willing to pay the defendant for the same, according to the terms of the said sale; and although the plaintiffs were ready and willing and offered to accept and receive the said starch from the said defendant, yet the said defendant, not regarding his said last-mentioned, promise, but contriving as aforesaid, did not, when requested as aforesaid, nor at any other time before or since, deliver to the said plaintiffs the said starch, or any part thereof; but hath hitherto wholly refused, and still doth refuse so to do; whereby the said plaintiffs have sustained great loss and damages, to wit, $2000, at the county aforesaid; and therefore they bring suit," &c.

The defendant pleaded *non assumpsit;* and upon this issue the cause came on for trial before PETTIT, Pres't, on the 11th of January, 1838, when the plaintiffs offered in evidence the contract or agreement upon which their claim was founded, proposing at the same time to follow it with evidence, that in respect to this contract, Thomas & Martin were only the agents or factors of the plaintiffs; and that the defendants knew that they were acting in that capacity; and that the plaintiffs were the parties in interest in the contract.

To this evidence the defendant's counsel objected; but it was admitted by the judge, and read to the jury, as follows, and exception taken.

" I have this day contracted with and sold to Thomas & Martin, all the starch I may manufacture this year, or have manufactured by my agency, hereby binding myself that the works which I am interested in and control, being two mills, shall not be increased within the above specific time, and that the quantity shall not exceed 1000 barrels; the fine at 5 cents, and the superfine at 7 cents per pound; barrels 20 cents; deliverable on board of vessels bound for Providence, or elsewhere, free of expense; payable in cash on delivery; the quantity warranted to be equal to that which I have delivered them this season. An adequate allowance shall and will be made for any which shall not prove of regular and approved quality, agreeable to this warrantee, or the starch shall be returned, as may be most satisfactory. It is agreed and understood, that if wheat advances so as to exceed $1 20 per bushel, a proportionable advance shall be made in the pound of starch, equal to one-third of a cent per pound, for 10 cents on the bushel, and that if wheat should decline so as to go below $1 00 per bushel, a corresponding deduction in the price of starch shall be made.

Philad. April 1, 1835.

(Signed)        JOHN HUBBERT.

It is understood that I am to allow Thomas & Martin their commission on the amount of the above contract and sale, 5 per cent.

(Signed)        JOHN HUBBERT."

The plaintiffs then produced one Samuel C. Stokes as a witness, who testified that he was present at the store of Thomas & Martin when the paper was signed. He was then asked what passed on the occasion. The defendant's counsel objected, but the witness was allowed by the judge to answer; and testified that the substance of the conversation was, that the contract was made by Thomas & Martin with the defendant, on account of the plaintiffs. The starch was to be put on board of the Providence packet, to be sent to the plaintiffs. The starch was not furnished according to the contract. The witness then stated, that he called on the defendant about the beginning of June, 1835, on the subject. The defendant's counsel objected to the witness testifying as to any conversation between him and the defendant; but the objection was overruled; and the witness said: " I asked him if there was any starch ready for Thomas & Martin on the contract. He stated he had had some, but had sold it. I told him that shipments of his starch were observed; and we had had complaints from our friends in Providence that his starch was arrived there in other hands. I told him that Borden & Bowen stated that they thought they had contracted for all the starch he could make during the season. He, the defendant, stated, that the contract amounted to nothing, as it could be evaded; that his name was not branded on the starch that was shipped, but his son's name, J. A. Hubbert. I asked him if he had no interest in it. He stated distinctly he had the profits arising from it, and that he superintended its manufacture. He said he had sold to Fales, Lathrop & Co., to Rhodes, and to Potter and M'Keever, three distinct lots, about sixty barrels. He mentioned he had obtained about 6 cents for the fine. I think this was the 30th of May, or beginning of June. I told him I was instructed by Thomas & Martin to request him to comply with his contract: that they should hold him accountable for not so doing. He said very well: he would be considered liable, if he must be so. I told him I was instructed to tell him so. He did not afterwards deliver or produce the captain's receipts for any as before."

The plaintiffs' counsel then offered in evidence certain letters of the plaintiffs to Thomas & Martin, to show the authority of the latter to make the contract in question; which were objected to on the part of the defendant, but admitted and read to the jury.

The witness Stokes then further testified, that there had been a previous contract between the plaintiffs and defendant, viz. in May, 1834. This contract was offered in evidence by the plaintiffs' counsel, and objected to; but admitted by the judge, and read to the jury, as follows;

" I have this day contracted with and sold to Thomas & Martin all the starch which I may manufacture this year, or have manufac-

tured by my agency; hereby binding myself that the works which I am interested in and control, being three mills, shall not be increased within the above specific time, and that the quantity shall not exceed 1200 barrels; the fine at 5 cents, and the superfine at 7 cents; barrels 20 cents; deliverable on board of vessels for Providence or elsewhere, free of expense; payable in cash on delivery; the quality warranted to be equal to that which I have already delivered them this season. An adequate allowance shall and will be made for any which shall not prove of regular and approved quality, agreeable to this warrantee; or the starch shall be returned, as may be most satisfactory. It is agreed, that if wheat advance so as to exceed $1 20 per bushel, a proportionate advance shall be made on the pound of starch, equal to one-third of a cent per pound, for 10 cents on the bushel; and that if wheat decline so as to go below $1 00 per bushel, a corresponding reduction in the price of starch shall be made.

Philada. May 19, 1834.

It it is understood that I am to allow Thomas & Martin their commission on the above contract and sale, say on the fine starch five per cent. and on the superfine two and a half."

"Agreed to and confirmed by

(Signed)     Thomas & Martin.

(May) 5 Mo. 19, 1834."

The witness then proceeded:

"Mr. Hubbert agreed to supply the starch according to the contract; he supplied none after to my knowledge. I have no knowledge of any other contract. Mr. Hubbert said they would not have the rough, and they should not have the smooth. He had two mills in 1835; three mills in the same factory in 1834. I have no knowledge of the profits of starch bought at that rate. The barrels would average about two hundred and ten pounds gross, and one hundred and ninety net. We paid for starch on other contracts made in 1835, the market price at the commencement of the season, five and one-third for fine, and seven and one-third for superfine. In April and May the market varied from six and one-third for fine to eight and one-third for superfine. The rates varied throughout the season between those prices, governed very much by the price of wheat. Starch rose and fell as the price of wheat rose and fell. Wheat varied from $1,27 or $1,28 to $1,60, per bushel throughout the season; like flour, starch was influenced by wheat. Mr. Bowen was on here just before this contract was made. He was advised in the store of Thomas & Martin of the progress of the contract." The counsel for the plaintiffs then proposed to ask what passed in the counting-house of Thomas & Martin between

(*Hubbert v. Borden.*)

Mr. Bowen and them in regard to their authority to make this contract prior to its execution, to which the counsel for the defendant. objected, and the judge overruled the objection, to which the defendant excepted, and the question was put by the plaintiff's counsel to the witness, who said, " The contract was presented in the same shape as the year before. A copy of the proposed contract was shown to Mr. Bowen. Thomas & Martin stated to him that Hubbert made difficulties about signing that contract. Mr. Bowen was surprised that he should hesitate to sign the contract, and addressed him a note. I don't pretend to say it was the same paper; it was the same in purport. I read them both; was familiar with them. I did not see the note. I saw Mr. Bowen go to the desk and write. I don't know to whom the note was given. The contract was signed about three days after or four." The witness being cross-examined by the defendant's counsel, further said, " The contract was executed at No. 10 North Front street. I don't know which of the firm of Thomas & Martin were by at the time; one of them was by. I can't say which. I don't recollect whether the contract was produced at the time by Mr. Hubbert or by one of the firm. I can't say if the contract was drawn on the day it was signed, or whether it was drawn while the parties were there. I was present at the counting-room when this contract was talked of previous to the first of April, 1835. I can't say if Mr. Hubbert signed at the counting-room or brought it there signed. I can't say if the contract was executed or in a state of being made at the time it was produced there. I can't give any answer on the subject whether I was present at the time the agreement was made. I heard frequent conversations previous to the first of April, but I don't know that the contract was ratified before that day. I know the contract was ratified on the first of April. I saw Mr. Hubbert then, and saw the contract after he left the store, with the defendant's signature to it. I don't know that I saw the contract in Mr. Hubbert's hands that day. I saw one of the firm have it in his hand that day, but I can't say if Mr. Hubbert was there at the time. I don't remember any distinct observation made by either of the firm to Mr. Hubbert in relation to the contract on that day, nor by Mr. Hubbert to the firm, nor by either of the parties when the contract was before them respecting it. My interest in the firm commenced January 1, 1837. Mr. Hubbert had been paid by a check drawn by Thomas & Martin. They bought of Mr. Hubbert for orders. They generally bought with an understanding it was for orders. We did not communicate the names of principals when we bought small orders. That is the handwriting of Thomas & Martin." The witness then read the paper at the request of the defendant's counsel to the jury, as follows : " Sold this day to Thomas & Martin, one hundred and twenty barrels of fine starch, of the best quality, to be delivered as soon as made at five cents per pound, allowing them five per cent.

(Hubbert v. Borden.)

discount for commissions. Philadelphia May 3, 1834." "I don't know if this contract was executed. The starch was shipped under the direction of Thomas & Martin; he, the defendant, delivered it. Thomas & Martin filled up the bills of lading, and had them signed. Mr. Hubbert was at dinner when I called. I asked him if he intended to furnish more starch. I made reference in my question to the written contract. I was sent by Thomas & Martin. He did not say that he had offered them the starch he had made. I have been called upon to take notice of conversations; never as a witness to a contract. I don't remember seeing either of the plaintiffs here more than once in 1835. Mr. Bowen was here the latter part of March one or two days; said he would write the defendant a note; sat down at the table. That is all I know of it. Forty-eight barrels were delivered under the contract. They were shipped by Thomas & Martin. Never saw plaintiffs and defendant together. I can't give any reason why the last contract was not signed by Thomas & Martin. I said six and two-thirds and eight and two-thirds, but it should be six and one-third and eight and one-third. We purchased a great deal of starch per orders for different people, hence I get my knowledge of the market price, and from the books of Thomas & Martin entries made therein by all in the store. I made some of the entries, and referred therein to my own entries for the price of starch in 1835, when the contract was made with the defendant, it was at about the market price—five and one-third and seven and one-third, that was the market price about that time, and the subsequent increase of price was regulated by the increase of the price of wheat." On his re-examination the witness said, "Forty-eight barrels I think were delivered by the defendant under the contract of 1835. I don't know of any refusal to take the rough. I frequently settled starch accounts in 1835. I thus derived a knowledge of the price of starch. I called on Neal & Barret and got the price of wheat throughout the year." The plaintiffs' counsel then asked what was the usual advance in profit in starch in 1835 in Philadelphia and Providence, to which the defendant's counsel objected, but the objection was overruled by the judge, and the defendant excepted, and the witness proceeded. "As respects this market I can't say; our purchases were for others. As respects Providence market I have no knowledge but from men there, told to me here from persons connected in that business. When I say market price I mean the price of the manufacturers. This is a bill of lading of April 8, 1835; Schooner R. Rush, forty-eight barrels of starch shipped by Thomas & Martin, fine, to plaintiffs. There is another September 4, 1834, by Thomas & Martin; this is Thomas & Martin's bill of lading book; all the bills of lading for defendant's starch literally like these. (Books given in evidence.) This letter is their, Thomas & Martin's, hand-writing, dated June 6, 1835. When defendant would deliver the starch to the vessel, and brought a receipt

(Hubbert *v.* Borden )

from the captain of the vessel, the bills of lading were signed to us by the captain."

James Martin was then called by the plaintiffs, and being affirmed on his *voir dire*, said that he had no interest in the contract, that he was one of the firm of- Thomas & Martin. "I have made no assignment of this contract to any one. Thomas & Martin have brought suit against the defendant for the commissions named in this contract. Thomas & Martin brought this suit and employed counsel. I was there, in Providence, in 1835, in July; the plaintiffs gave us no instructions in July to bring this suit. I have not a farthing's interest in this suit. They gave us instructions to consult counsel, and conditionally to bring suit against the defendant." The defendant then objected to the competency of the witness to prove the matters proposed to be proved by him, by the plaintiffs, which objection was overruled by the judge; exception taken, and the witness being affirmed in chief, testified as follows: "We were the agents of the two parties, both understanding we were so. This agreement of the 1st of April, 1835, was executed under that agency. I believe the defendant knew who the starch was for, by frequent reading of letters of plaintiffs to us. I have read them to him, and he has handled them himself. We also read him our own letters addressed to the plaintiffs. The contract was made at the request of the plaintiffs, and under their direction. Their direction was by letter, and one of them was here in March, and he verbally, and after by letter when here; he wished it to be done, as it had been made the previous year. I told the defendant that the plaintiffs would wish to have superfine alone, but if he would not agree to that, then they would take fine and superfine both, as the year before. The agreement was verbally made by myself several days before it was ratified in writing. There was but one delivery after the contract was made. I never had any connection with him after the contract was given up or broken by him. I knew the price of starch that year by what I heard from others; there were frequent settlements made with others, and purchases made from others as agent for plaintiffs; market price to buy that year, 1835, in April, fine, five and one-third, super, seven and one-third; that was the price in the contract. Defendant's starch could not have been had except from himself. I had a good knowledge of the general supply of starch in this market that season. I recollect that year only one manufacturer of super but what was then engaged. Don't know of any but the defendant from whom the super could have been got that year. Don't know that we could have got that amount from Kebb. Defendant's super very good, with the exception of "Cider Spring." No starch had better character in Providence; this, as to fine and super, our own observation limited. Only acted as agent, and there it closed. The plaintiffs fully apprised of the contract we made with Hubbert. The plaintiffs

received the starch forwarded to them. Never had conversation with defendant about the contract, after the contract was made; we received no commissions from the plaintiffs." On cross-examination—"The contract was in Jacob Thomas's writing. I was not present when the defendant signed it. I understood there was a counterpart. I don't know there was a counterpart."

John B. M'Keever, a witness produced on the part of the plaintiffs, was asked, " What did you pay the defendant for starch in May, 1835?" The question was objected to by the defendant, but admitted, and the witness proceeded. "On the 28th of May, 1835, I paid the defendant six cents, two and a half per cent. off, for cash, for twenty-seven barrels of fine starch; 20th of May, 1835, paid him six, two per cent. off. Twelve barrels here on the bills of the defendant." Cross-examined.—" I don't know when this starch was made, in 1834 or 5. Bought on our own account; two per cent. not a commission. Don't know the price of wheat in May. Price of starch regulated in some degree by the price of wheat. I don't know of any body who buys here from manufacturers and sells again here." Re-examined in chief.—" I know the price of starch in 1835 in Providence." The witness was then asked, what difference there was in the buying price here and selling price in Providence in 1835, which was objected to by the defendant, but admitted, and the witness said,—"The Providence market made us a handsome profit, at least of six per cent. on the invoices for the year 1835. Can't say what I made on the Hubbert starch alone." Re-cross-examined.—" I was not in Providence in 1835. I derive my knowledge from sales. Can't state a single case to whom sold, or price at which sold. Sold on credit generally; say four months. Can't tell wholesale price in Providence in that year. Can't tell the exact price of fine starch in May and June in Providence. I can only speak of ourselves, but not of others. It afforded us a profit."

The defendant then offered in evidence the written agreement of Thomas & Martin and Strattons, to show that it was *ratified* on the 27th of January, 1835, by Thomas and Martin, which was given in evidence.

The evidence having been closed, the counsel for the defendant requested the judge to instruct the jury as follows:

" 1. That John Hubbert having bound himself in writing by the instrument of the 1st of April to Thomas & Martin, is by that instrument bound to them, and not to the plaintiffs.

2. That at law it is not competent for the plaintiffs to show by verbal proof, that the contract between Thomas & Martin and J. Hubbert was and is so intended by both parties to be a contract between the plaintiffs and the defendant.

(Hubbert *v.* Borden.)

3. That the plaintiffs, to make it their contract, must show authority to Thomas & Martin to make such contract in their own name; and that the contract was made pursuant to their authority, or that the instrument has been submitted to and ratified by Borden & Bowen, and that the defendant has been notified of such ratification.

4. That John Hubbert having made an express contract in writing with Thomas & Martin, the law will not imply from circumstances or proof of general agency by Thomas & Martin in their behalf, a contract between the plaintiffs and the defendant.

5. That the defendant is not liable under his contract for not delivering 1000 barrels of starch, but is liable only for not delivering the starch proven to have been made by him.

6. That the measure of damages is the difference, if any, between the price stated in the agreement and the value of starch above the advance of one-third of a cent per pound for every 10 cents in advance of wheat per bushel, at the time of the defendant's refusal to deliver the same at Philadelphia.

7. That Thomas & Martin, acting as agents for Borden & Bowen, in making a contract with John Hubbert in writing, in which Thomas & Martin and John Hubbert appear to be parties, cannot act as agent for John Hubbert in making such contract with him."

The judge then delivered his charge to the jury in substance as follows:

" The first question is, was there a contract between the parties ? The defendant maintains the negative; in the first place in point of strict law; and secondly in point of fact.

As to the law, it is said that the paper of the first of April, 1835, concluded the defendant with Thomas & Martin, and no one else ; and that it is not competent to the plaintiffs to prove that the contract really was between the plaintiffs and the defendant.

This is the proposition into which the 1st, 2d, 3d, 4th and 7th of the defendant's written points may be resolved.

It is to be observed, that the plaintiffs do not declare on a written contract. Upon this part of the case I state the law to be, that if the jury are satisfied from all the evidence that the plaintiffs authorised, either by letter or verbally, Thomas & Martin to make a contract for them with the defendant; that it was made accordingly; and that the terms of it are set forth in the paper of the first of April, 1835; or if the jury are satisfied that, after such a contract was made with the defendant on behalf of the plaintiffs, the plaintiffs recognised and confirmed it, either by letter, by words, or by acts, the plaintiffs would be bound by it to the defendant, notwithstanding the form of the written instrument of the 1st of April, 1835 : and being so bound to the defendants, the defendant is equally bound to them.

The written paper of the 1st of April, 1835 is not in truth the

(Hubbert v. Borden.)

contract; it is but a statement of the terms. If it had not been signed by any one, but had yet been recognised by both plaintiffs and defendant as containing the terms of a contract between them, it could be used as evidence by either party: and to exclude additional testimony showing who the real contracting parties were, would be a misapplication of the general rule which prohibits the admission of parol evidence to destroy, control, add to, or alter a written instrument.

The judge then summed up the evidence as to the existence of a contract, and the alleged breach of it; and submitted the questions of fact to the decision of the jury.

The judge then summed up the evidence in relation to the claim for damages, and leaving all questions of fact to the determination of the jury, noticed the 5th and 6th of the written points of the defendant's counsel.

The judge said, that there is a general rule as to the standard of damage which the law enjoins, wherever it is susceptible of application. It is this : the measure of damage is the difference between the price contracted for, and the price at the time and place of delivery. 3 *Wheaton*, 200. 7 *Cowan*, 681. He explained the general grounds of the rule, and remarked, that there are some cases in which it cannot apply ; inasmuch as the reasons on which it is founded entirely fail to operate. For instance, if the vendee had advanced his money to the vendor, and so has not the means of effecting another purchase ; or if there be no goods of a similar kind in the market, so that price cannot be affirmed in regard to them.

In the case before us, no money was advanced ; and the inquiry then presents itself, was there a market price at the time and place of delivery?

The judge here instructed the jury to reject every thing that was stated by the witnesses as to market price or profits at Providence. He said that the evidence had been allowed under a misapprehension on the part of the judge as to the construction of the terms of the contract relative to the point of delivery ; and being altogether immaterial to the case, should be disregarded.

The place of delivery was on board of vessels at Philadelphia ; the destination not being an ingredient to the contract.

The time comprehended the season or the year, as the two mills of the defendant, which were not to be increased, could furnish the article.

As to the market price at Philadelphia, during the season in question, the judge summed up the testimony, and left the questions of fact to the jury.

He added, that though the defendant is liable under the contract only for the delivery of the starch he actually manufactured, yet as the contract was based upon a supposition on both sides, that the defendant might be able to make as much as 1000 barrels; and as

(Hubbert *v.* Borden.)

he alone is cognizant of what really was made, the burthen of proof on this point was thrown upon him; and in the absence of all explanation, the jury will be justified in assuming that 1000 barrels were manufactured. If a smaller quantity be shown to have been all that was manufactured, then the actual quantity will be assumed by the jury.

The judge also said, that if the defendant had failed to comply with his part of the contract, and now rested his justification in part or in the whole upon a change from time to time during the season in the market price of wheat, the jury might expect him to furnish any additional evidence necessary to sustain that defence. If a more minute knowledge on this point was important to the defence, and the defendant had it in his power to furnish it, and omitted to do so, the jury might presume most strongly against him within the limits of the contract, and the testimony already before them.

The judge left it to the jury to determine for themselves, whether the general rule that had been laid down as to the measure of damage could be applied under the circumstances of this controversy: if it could, it was their duty to adopt it. If it was inapplicable, he said the law furnished no precise standard of damage, and the jury, looking at the whole case, must exercise a sound judgment upon the subject.

The defendant's counsel excepted to this charge; and the jury having found a verdict for the plaintiff, this writ of error was taken out; and the following errors assigned:

" 1. The evidence did not sustain the declaration.

2. The suit was commenced before the expiration of the period within which the contract was to be performed.

3. The court erred in admitting all the evidence excepted to by the plaintiff in error, upon the trial, viz.:
1. The agreement of April 1st, 1835.
2. The evidence of the conversation between Hubbert and Thomas & Martin when the agreement was made.
3. The evidence of Stokes of conversation, between him and Hubbert, of June, 1835.
4. The whole of Stokes's evidence.
5. The seven letters of defendant in error to Thomas & Martin.
6. The answer by Stokes to the question: viz. " What passed in the counting-house of Thomas & Martin between them and Bowen, in regard to authority to make the contract?"
7. The answer of Stokes to the question: " What was the usual advance in profit on starch in 1835, here and in Providence ?"
8. The whole of the testimony of James Martin.
9. The answer of M'Keever to the question: " What did you pay defendant for starch in May, 1835 ?"

(Hubbert *v.* Borden.)

　　10. The answer of M'Keever to the question, viz.: "What difference was there in the buying price here and selling price in Providence, in 1835?"

4. The court erred in charging the jury—
　　1. Against the points submitted for charge by the plaintiff in error.
　　2. That the burthen of proof as to the amount of starch manufactured by the plaintiff in error was thrown upon him; and that the jury might presume that he had made 1000 barrels of starch.
　　3. That the jury might presume against the plaintiff in error as to the price of wheat, &c.

5. The whole charge was erroneous."

　　Mr. *Kennedy,* (with whom was Mr. *F. E. Brewster,*) for the plaintiff in error, cited *M'Kennan* v. *Doughman,* (1 *Penn. Rep.* 419.) *Collam* v. *Hocker,* (1 *Rawle,* 112.)　*Gilpin* v. *Consequa,* (1 *Peters's C. C. Rep.* 87.)　4 *Vesey,* 502.　*Stackpole* v. *Arnold,* (11 *Mass. Rep.* 27.)　*Heagy* v. *Umberger,* (10 *Serg. & Rawle,* 343.)　*Parkhurst* v. *Van Cortlandt,* (1 *Johns. Ch. Rep.* 282.)　*Meyer* v. *Barker,* (6 *Binn.* 234.) (*Umbehocker* v. *Russell,* (2 *Yeates,* 339.) *Hopkins* v. *Mehaffey,* (11 *Serg. & Rawle,* 128.)　*Campbell* v. *Baker,* (2 *Watts,* 84.) *Mayhew* v. *Prince,* (11 *Mass. Rep.* 55.)

　　Mr. *Price,* (with whom was Mr. *David Paul Brown,*) for the defendants in error, cited *Girard* v. *Taggert,* (5 *Serg. & Rawle,* 27.) *Hammond on Parties to Actions,* 32.　*Livingston* v. *Swanwick,* (2 *Dall.* 301.) *Strohecker* v. *Grant,* (10 *Serg. & Rawle,* 241.) *De Bollé* v. *Penn. Ins. Co.* (4 *Wharton's Rep.* 74.)　*Mechanics Bank* v. *Bank of Columbia,* (5 *Wheaton,* 326.)　*Borrekins* v. *Bevans,* (2 *Rawle,* 39.)　*Munahan* v. *Colgin,* (4 *Watts,* 436.)　*Mehaffy* v. *Share,* (2 *Penn. Rep.* 377.)　2 *Smith's Leading Cases,* 163.　*Gregory* v. *Setter,* (1 *Dall.* 193.)　*Thomson* v. *White,* (1 *Dall.* 426.)　*German* v. *Gabbald,* (3 *Binn.* 302.)

　　The opinion of the court was delivered by

　　KENNEDY, J.—Three questions appear to embrace all that is material in the errors assigned.　First; can this action be maintained in the names of the plaintiffs below, by showing that the written agreement, given in evidence on the trial, was made by the defendant there, with Thomas & Martin, for the benefit of the plaintiffs below; and that Thomas & Martin were employed by them to obtain from the defendant the engagement contained in said agreement on his part to be performed, for the breach of which this action has been instituted?　Second; supposing the plaintiffs below to have such an interest in the engagement of the defendant, as to enable

(Hubbert *v.* Borden.)

them to maintain the action for a breach of it in their own names, had they a right to commence it before the expiration of the year therein mentioned? And third, did the learned judge of the court below charge the jury erroneously or not in regard to the inference, which they might draw, as to the quantity of starch manufactured by the defendant within the year before the commencement of the suit, from the circumstance of his declining to show the actual amount; or in regard to the presumption that the jury might make, as to the price of wheat during the same period, in the absence of direct evidence showing precisely what it was?

The first question will, it is conceived, embrace all the bills of exception taken to the opinion of the court, admitting the evidence objected to by the defendant below: for, if the existence of the facts which the evidence was offered to prove, will entitle the plaintiffs below to maintain the action, it would seem to follow clearly, that the evidence was admissible. This, then, would leave nothing in regard to the evidence to be decided on, excepting its competency to establish the facts; which will receive a passing notice.

Though the engagement of the defendant is reduced into writing, yet it is considered in law nothing more than a parol agreement; that is, the same as if it had been made verbally, without writing. And where such an agreement has in fact been made for the benefit of a third person, whose name is not mentioned in it, I apprehend it has never been doubted that parol evidence was admissible to show that the fact was so; as also the name or names of persons for whose benefit it was intended. It is every day's practice to admit parol evidence for the purpose of establishing a use, and showing who is the beneficiary, where it does not appear upon the face of the instrument containing the grant or creating the obligation: and this may be done even where the instrument is under seal, unless it relates to lands, and the admission of such evidence should be thought to contravene the act of assembly against frauds and perjuries. It is a great misapprehension to suppose that the admission of parol evidence for such purpose trenches upon the general rule which prohibits the admission of such evidence for the purpose of altering a written agreement, by either adding to or taking any thing from it. To prove, by such evidence, the interest of a third person in the written agreement, does not in general vary or contradict it in any respect whatever; but is effected by proving another agreement or understanding between the beneficiary and one of the parties to the written instrument; which is perfectly reconcilable therewith, or at most, never prejudices the rights or increases the obligation of the other party thereto. So far, therefore, as the evidence offered by the plaintiffs below, tended to prove their interest in the contract made with the defendant by Thomas & Martin, by showing that it was made by Thomas & Martin, under the authority of the plaintiffs, and for their benefit, it was clearly admissible. But whether the

establishment of this fact be, in law, sufficient to enable the plaintiffs below to maintain such an action as the present, in their own names, for a breach of the engagement of the defendant, made to Thomas & Martin personally, without any mention of them as agents for the plaintiffs, might probably at one time in England have been a question upon which judges, and courts, possibly, would have differed in opinion. For on the question, where a promise is made to one for the benefit of another, whether, in case of a breach of such promise, the action ought to be brought in the name of the promisee or the beneficiary, we have decisions that seem to be irreconcilable with each other. According to 1 *Rolle Abr.* 30 L. 44, 31 L. 15, it was ruled, that the action of assumpsit might be maintained by him, to whom the promise was made, notwithstanding the benefit accrued to another; as if a man promise A. to give money to his daughter, when she marries, A. may have the action. See also 1 *Com. Dig.* tit. Action upon the Case upon Assumpsit, (E). So in *Taylor* v. *Foster*, (*Cro. Eliz.* 807,) where the defendant, in consideration that the plaintiff would marry his daughter, assumed to pay for him to J. S., to whom he was indebted, 100*l.*; and held, that the action would lie. But in *Scott* v. *Hawes*, (*Cro. Eliz.* 619. 652,) it was held, that the father could not maintain assumpsit on a promise made to him by the defendant to pay 200*l.* to the son of the plaintiff, in consideration that the son would marry the defendant's kinswoman; and that the father would assure to her bonds of 10*l.* per annum, for her jointure; but that the action ought to have been brought by the son. Likewise *Rippon* v. *Norton*, (*Cro. Eliz.* 849,) was decided in conformity to the same principle. So upon a promise to B. to pay 20*l.* to an infant at his full age, and to educate him in the mean time, it was held that the infant should have the action. 1 *Rolle Abr.* 31. L. 35. Or if money be given to A. to deliver to B., B. may have the action. 1 *Roll. Abr.* 7. l. 10. 32 l. 30. *Hardr.* 321. See also 1 *Vin. Abr.* 333 to 337, tit. Actions of Assumpsit, (Z) where all the old cases are collected on this subject and brought together. Ultimately, however, in *Dutton* v. *Poole*, (2 *Lev.* 210; 1 *Ventr.* 318,) the point seems to have received great consideration, and to have been solemnly decided. There the father of the plaintiff's wife being seised of a wood, which he intended to sell to raise fortunes for his younger children, the defendant being his heir, in consideration that he would forbear to sell it, promised to pay his daughter, the plaintiff's wife, 1000*l.*; for the non-payment of which the action was brought, and held by the King's Bench, that the plaintiff might maintain it. This decision was afterwards affirmed upon writ of error by the Exchequer Chamber. Some stress, it is true, was laid upon the nearness of the relationship between the plaintiff's wife and her father, to whom the promise was made. But in the later case of *Martin* v. *Hinde*, (*Cowp.* 437,) the principle of it was fully sustained, where no relationship of any sort existed. And in *March-*

*ington* v. *Vernon,* (1 *Bos. & Pull.* 101, *in notis,*) BULLER, Justice, says, " If one person makes a promise to another for the benefit of a third, that third may maintain an action upon it." Accordingly, the late Mr. Justice DUNCAN, in delivering the opinion of this court in *Strohecker* v. *Grant,* (1 *Serg. & Rawle,* 241,) lays it down, that the person, for whose benefit the promise is made, may support an action of assumpsit for a breach thereof; but not so in the case of a covenant made under seal to one for the benefit of another. There the action must be covenant, and brought in the name of the person with whom the covenant is made : and the same rule as in covenant may also be applicable to promissory notes and bills of exchange, where the plaintiffs in their actions declare upon them. See as to the distinction in this respect, *De Bollé* v. *Penn. Ins. Co.* (4 *Wharton's Rep.* 74.) In *Blymire* v. *Boistle,* (6 *Watts,* 183,) the rule which governs now in the case of parol contracts, and determines by whom the action shall be maintained, seems to be accurately stated and laid down by Mr. Justice SERGEANT : and upon it that case was determined. The distinction taken there is, that " If one pay money to another for the use of a third person, or having money belonging to another, agree with that other to pay it to a third, action lies by the person beneficially interested. But where the contract is for the benefit of the contracting party, and the third person is a stranger to the contract and consideration, the action must be by the promisee." In other words, whenever such third person must be the loser or party injured by the non-peformance of the promise, justice would seem to require that he should be permitted to maintain the action ; and more especially in those cases where the consideration for making such promise is to come from him. It is true that in most of the cases stated or referred to above, if not in all, the party for whose use or benefit the engagement was made, was mentioned or named at the time ; but that can make no material difference to the promiser, because generally it must be a matter of indifference to him whether the promisee or a third person is to be benefitted by the fulfilment of his promise. And it will be found in many cases of contracts, made by factors for their employers, that the contracts were made by them, without their making known their principals ; and that the same rule, in regard to the maintenance of actions for the breach of such contracts, has been held to obtain, as when the contracts have been made in the names of the principals or employers, excepting in some few instances ; for example, where there is a debt owing by the factor to the party promising ; in which case the latter would have a right to set it off, whether the suit was brought in the name of the factor or the principal, where the factor contracts, as it were in his own right without disclosing that he has a principal. The factor is regarded as the instrument merely by whom the principal acts. He may, it is true, maintain an action in his own name, for a breach of the contract made by him for the benefit of his

principal; but still the principal may, notwithstanding, take the matter into his own hands out of that of the factor; and may maintain a suit in his own name if the contract should be broken by the other party. *Girard* v. *Taggart*, (5 *Serg. & Rawle*, 27–8.) We also have the case of *Livingston et al* v. *Swanwick*, (2 *Dall.* 300,) where Samuel Anderson, a broker of this city, entered into a written contract with the plaintiff of New York in the following terms: "I do hereby engage to deliver to John R. Livingston, Esq., the engagement of John Swanwick, Esq., of Philadelphia, to deliver to John R. Livingston, Esq., aforesaid, one hundred shares of the bank stock of the United States, on the 5th of January next ensuing, upon receiving from the said J. R. Livingston payment for the same, at the rate of twenty-one shillings and sixpence in the pound.

(Signed)                SAMUEL ANDERSON."

New York, 15th July, 1791."

On the trial of the cause, the plaintiffs produced a correspondence between Anderson and the defendants in relation to the contract after it was made, and then offered Anderson himself as a witness, to prove that he had received a verbal authority to make the contract for the defendant; that he had accordingly executed the foregoing; and that there had been a punctual compliance with the stipulations on the part of the plaintiffs. The defendant objected that Anderson was not competent to prove his own authority; and that he was interested in the question, as he had an action actually depending for his own commission on making the contract. The court, however, overruled this objection, saying, "that he was competent to prove every part of the transaction; that he was not interested in the event of the suit; nor could the verdict, in that action, be given in evidence upon the trial of the action for his commission." It was also objected then that the written contract was variant from the one declared on, inasmuch as the written contract was to deliver to J. R. Livingston only, but the action was in the names of Brockholst and J. R. Livingston; which was also overruled by the court, who said the objection to the form of the action ought not to prevail; that the contract was proved by the testimony of Anderson; and the written paper was merely corroborative; that it was understood at the time of making the contract, that Mr. Brockholst and J. R. Livingston were jointly concerned; and that of course it was made for their joint benefit. This case would seem to meet and to overrule the most, if not all, of the exceptions taken to the opinion of the court below, admitting evidence, and likewise to the charge given to the jury in the case now under consideration. It shows, first, That the written engagement of the defendant below was properly admitted in evidence. Second, That the conversation between the defendant and Thomas & Martin, before the contract was entered into, was rightly admitted, for the purpose of showing that the defendant was informed by Thomas & Martin, that it was sought to

(Hubbert *v.* Borden.)

be made for the benefit of the plaintiffs. Third, That the conversation between the defendant and Stokes, who was directed by Thomas & Martin to call on the defendant in order to ascertain from him whether he had been making and disposing of his starch otherwise than to the plaintiffs, or the orders of Thomas & Martin, was not only proper, but was the very best evidence to prove what was indispensably requisite, in order to maintain the action; that is, a breach of the contract on the part of the defendant, and a determination not to fulfil it. Fourth, That the correspondence between the plaintiffs and Thomas & Martin was properly admitted, because it showed the authority which the latter had from the former to make the contract on their behalf, and likewise the terms and conditions upon which it was to be made with the defendant. Fifth, That Mr. Martin was a competent witness to prove every part of the transaction, as also his authority to act in it for the plaintiffs. Sixth, That the variance alleged by the counsel for the defendant, to exist between the contract and the declaration, was wholly immaterial in point of either law or fact. For the declaration was not drawn upon the written contract, as in the case of an action founded upon a deed, specialty, or promissory note. But the written agreement, in connection with the evidence showing that it was made for the benefit of the plaintiffs, was all admissible, and went to prove very fully the contract set out in the declaration. And "it would be," as the learned judge of the court below said, "a misapplication of the general rule, which prohibits the admission of parol evidence to destroy, control, add to, or alter a written instrument," to exclude oral evidence from showing that the party named in the instrument, to whom the promise is made, was in reality the agent or factor of the plaintiff, and that he obtained the promise for the benefit of such plaintiff. In no case will such evidence, though admitted, be suffered to prejudice the rights of the promiser; and generally it is for his advantage that it should be admissible, because it will increase his security, by making the principal as well as the agent liable to him for what he will be entitled to receive in consideration of his having fulfilled his engagement. For instance, in the present case, Thomas & Martin by taking the written engagement of the defendant below to themselves personally, impliedly at least, become bound thereby to pay the defendant for the starch, as it should be delivered by him to them, according to his undertaking: and had the defendant gone on and fulfilled his engagement, and Thomas & Martin had failed to pay him, he, by showing that they were the factors or agents of the plaintiffs in the transaction, would have had a right to have demanded payment from the plaintiffs, and to have compelled it by suit if necessary.

Having shown that the interest and connection, which it was proved, the plaintiffs had with the contract, made with the defendant by Thomas & Martin, were such as to enable them to maintain

a suit against the defendant, in their own names, for a breach of it, we come now to the consideration of the second question. Had they a right to commence it before the expiration of the year? From the nature of the contract, and the evidence given on behalf of the plaintiffs, on the trial below, it is impossible to doubt of their right to maintain this action at the time they brought it, and indeed, as it would seem from the evidence, might have brought it long before, notwithstanding the year was not up. Although the plaintiffs were to have all the starch which should be manufactured by the defendant within the year, yet, according to a fair interpretation of the contract, the defendant was bound to let the plaintiffs or Thomas & Martin for them, have it as it should be made. That such was the intention of the parties, is most clearly indicated by the terms of the contract, and the subject-matter of it. It is the universal practice of the manufacturers of such article to dispose of it as soon as convenient after being made; and the evidence goes to show that such was the practice of the defendant; for shortly after making the contract he delivered to Thomas & Martin, for the plaintiffs, forty-eight barrels; but instead of continuing thereafter to deliver it as made by him, he, in direct violation of his contract, sold and delivered it to other persons. The instant that he thus disposed of any portion of the starch manufactured by him within that year, he broke his engagement with the plaintiffs, and became liable to be sued by them. By disposing of his starch to other persons than the plaintiffs, he not only deprived the latter of it, when they, according to his engagement, were entitled to have it, but put it out of his power to deliver it to them at any subsequent time whatever; and it would seem, from the evidence, that he avowed his determination to deliver no more to them than what he had done. It therefore appears that he has not even the least shadow of pretence for saying that the action was brought prematurely.

Then as to the third question. Did the court err in directing the jury that, " as he (the defendant) alone was cognizant of what he really made, the burthen of proof, on that point, was thrown upon him; and in the absence of all explanation, the jury would be justified in assuming that 1000 barrels were manufactured: if a small quantity be shown to have been all that was manufactured, then the actual quantity will be assumed by the jury?" This action was commenced a month and twenty days before the expiration of the year; but probably after that portion of the year, most favourable for making starch, had passed by; and when the defendant might possibly have manufactured 1000 barrels of it. It must be presumed that he knew the quantity which he had made within the year, anterior to the commencement of the action, and that he could have shown on the trial, had he pleased, what it was; a thing which it would have been difficult, if not impossible, for the plaintiffs to

(Hubbert *v.* Borden.)

have done.   If the quantity actually manufactured by the defendant within the year, had been less than 1000 barrels, as it would have been for his benefit to have shown it, it may fairly be presumed that he would have done so ; but not having done so, we think the court was right in leaving it to the jury to assume the fact, if not contradicted by the evidence given, that he had made that quantity.

We also think that the court was correct in the instruction given to the jury in regard to the price of wheat.   If the change in the price of that article created and placed any difficulty in the way of the defendant's fulfilling his contract, it certainly rested with him to show it.   But if he did not choose to do so, no presumption in regard . to it could be made in his favour ; on the contrary, we think the jury were at liberty to presume most strongly against him, keeping within the limits of the contract and the evidence on that point before them.   The prosperity and peace of society depends greatly upon an honest and faithful observance of contracts : the individual, therefore, who wilfully refuses to fulfil his contract, when able to do so, has no claim to favour at the hands of a jury when brought before them for a breach of it.   If, however, he alleges any extenuating circumstances, he must make proof of them, otherwise his allegation ought to be disregarded.   The judgment is affirmed.

                                                 Judgment affirmed.