# Joseph Iddings, Appellant, *v.* The Equitable Gas Company.

*Oil and gas lease—Failure to sink well.*

A supplemental agreement, based on a valuable consideration, bound the lessee to sink a third well and to pay a fixed sum or rental therefor, provided gas was found in paying quantities. *Held*, that this was the test of liability, and not the relative production, or the effect of the work on wells already sunk.

*Gas lease—Default by lessee—Damages.*

Where under the lease the presence or absence of gas in paying quantities may be determined by the convincing method of sinking a well as thereby called for, upon failure to sink the well the defaulting party becomes liable to pay the actual damages sustained.

*Gas lease—Failure to sink well—Measure of damage.*

Where by not sinking a well as stipulated in a contract the defendant lessee has by his default deprived the lessor of this test, the value placed upon success may properly be deemed, prima facie, the just measure of compensation for the default.

*Evidence—Effect of suppression by a party—Presumptions.*

Upon the suppression or spoliation of evidence by a party or the failure to produce it when within his control, the jury may presume that its effect had it been produced would have been unfavorable to him.

The individual who wilfully refuses to fulfil his contract if he alleges any extenuating circumstances must prove them. No presumptions arise in his favor.

Argued April 18, 1898. Appeal, No. 107, April T., 1898, by plaintiff, from judgment of C. P. Westmoreland Co., Aug. T., 1894, No. 1698, on verdict for plaintiff. Before RICE, P. J., BEAVER, REEDER, ORLADY, SMITH and PORTER, JJ. Reversed.

Assumpsit on oil and gas lease. Before McCONNELL, J.

The plaintiff. claimed $150 as due under the terms of the lease.

The essential facts sufficiently appear in the opinion of the court.

Verdict and judgment for plaintiff for $100. Plaintiff appealed.

*Errors assigned* were (1) in sustaining the offer of defendant to prove by Mr. Duffield, an expert, that in his opinion had a third well been drilled there did not exist gas in sufficient quantities to justify marketing the same in September, 1891, and in admitting the testimony of Mr. Duffield thereunder. (2) In admitting in evidence the book showing the record of the rock and minute pressures of wells on the Iddings farm in 1891. (3) In the general charge to the jury in submitting as a question of fact whether the drilling of a third well would have reduced the pressure of all the wells below the line pressure of the Equitable Gas line and in quoting from the deci-

sions of the Supreme Court in relation thereto, there being no evidence of what that line pressure was, and the decisions of the Supreme Court not being in point and tending to mislead the jury, the charge and quotation being as follows: "Now, we have cases in which the nature of the evidence that is set up here has been discussed by our Supreme Court. It is contended by the defendant's witnesses that the pressure, the rock pressure of the wells in this immediate neighborhood had fallen so rapidly that gas did not, within the meaning of the contract, exist in sufficient quantities to justify marketing the same if this third well were put down. Evidence has been introduced showing, it is claimed, the rapid fall of this rock pressure. It has been said in a case that was considered by the Supreme Court on this branch of the case: 'Gas cannot be gathered, stored or transported in this manner,' that is, in the manner of gathering, storing and transporting oil. 'If found in sufficient quantity, it is turned from the well into the line, and the pressure at the mouth of the well is the motive power by which it is driven through the line to the consumer, miles away. If the pressure, at a given well, is much below that in the line with which it is connected, the gas from that well cannot enter the line, but will be driven back by the superior force it encounters at the point of connection. For this reason, a well producing gas in sufficient quantity to be profitably utilized if there was a market for it near at hand, may be entirely valueless if its product must find a market at a distance too great to justify its transportation by a line of its own. . . . When the pressure in any one falls below the standard necessary for purposes of transportation, that well must be turned off. Its product cannot be transported separately and unless it can be used near by, it is valueless. These well-known facts, peculiar to the production of gas, must be taken into account in the construction of leases for gas purposes.' And then again it is said in the same opinion: 'The lessee may have a good well, from which he can utilize the gas with profit. He may put down another on the same farm, and thereby so reduce the pressure in the first as wholly to destroy its value, without getting a sufficient pressure at the second to enable him to utilize that. The gas, if coming from one well, would be of great value. Divided in such manner that the volume and pressure at each is below the

the necessary standard, the whole is lost.' I read these extracts because it very completely and accurately states the side of the case that is contended for by the defendant in this case, and to support which contention they have introduced evidence. It is contended by the defendants in this case that had this third well been put down under the circumstances, the falling pressure of the field in general, that it would have had the effect to have reduced the product of not only the third well, but in all probability of the other two wells on this tract below the point where gas would exist in such quantities as to justify marketing the same; that a reduction of this pressure would have had a tendency to make what came from that well, or make that well rather, not a contributor to the gas in the main line, but rather a leak from it." (4) In not striking off the verdict and granting a new trial to the plaintiff. (5) There was no evidence to warrant a verdict of $100, as the plaintiff was entitled to the payment of $150 in ten days from the completion of the well, if the drilling of a third well would not have reduced the pressure so that the defendant would not have been justified in marketing the gas, the plaintiff was entitled to a verdict for $150, or more, or if the drilling of a third well would so have reduced the pressure, he was entitled to nothing.

*Denna C. Ogden,* with him *G. B. Shaw,* for appellant.— Young v. Equitable Gas Co., 5 Pa. Superior Ct. 232, rules this case.

*Paul H. Gaither,* with him *Cyrus E. Woods,* for appellee.— This is a case for unliquidated damages. It is easily distinguishable from the case of Young v. Equitable Gas Co., 5 Pa. Superior Ct. 232, in which case the point was that the defendant must drill three walls or pay rental for his default. The point is here that the defendant must drill well No. 3 if the plaintiff furnish gas in sufficient quantities to justify marketing the same. Expert testimony as to that fact was warranted to corroborate the actual proofs: Wells v. Leek, 151 Pa. 431.

OPINION BY SMITH, J., July 29, 1898:

The contract between these parties gave the defendant the

exclusive possession of the premises described, with the sole right of operating thereon for oil and gas, for ten years. The original lease bound him to complete a well within ninety days, under a penalty of $90.00 a year until completion, and gave him a right to sink other wells at his discretion. It fixed the compensation to the lessor by a provision that " should gas be found in sufficient quantities to justify marketing the same, the consideration in full to the party of the first part shall be $300 per annum for the gas from first well, so long as it shall be sold therefrom, and only $200 for each and every other well." The first well having been completed, and a second decided on, a supplemental contract was made, modifying the terms of the lease with respect to a third well by the following provisions : " In lieu of $300 to be paid as in said lease for well No. 1 and $200 to be paid as in said lease for well No. 2, provided for annually for all wells drilled, it is now agreed that the said company or assigns is to drill a well No. 3 on said farm, and for which the said company or assigns is to pay to said first party hereto the sum of $150 for well No. 3, at the same time and in the same manner as provided for in payment in said lease of $300 and $200 per well. This price is not to fix the price for wells drilled subsequent to No. 1. This shall not change or modify the covenant and agreement in said original lease except as to the price to be paid annually by second party, and also that well No. 3 is to be paid for in ten days from completion of well, and also that there is to be no damage to pay for by said company in operating on said farm."

The defendant completed the second well, and both first and second yielded marketable quantities of gas up to the commencement of this suit. The company failed, however, to sink the third, and the present action is brought by the lessor for this breach of the contract. The defense set up is that, in the opinion of experts, a third well on the premises would not have yielded gas in marketable quantities, and would also have diminished the yield from the other two ; hence that no loss has resulted to the plaintiff from the failure to open the third. The question thus raised is whether the rights and obligations of the parties depend on the terms of their contract, or on the opinions of third persons respecting the advantages of performance by the defendant.

At the date of the supplemental contract, gas in marketable quantities had been found on the premises. One well was in operation, and another was soon to be opened. With these conditions in view, the defendant's option as to additional wells was, by this contract, changed to a positive agreement to sink a third, in consideration of a reduced rental therefor, and a release of damages. On this point, the defendant's undertaking was absolute. It was in no sense contingent on the production of gas at the third well, and was in no way qualified by the possibility that none might be found. Nor did the consideration depend on the quantity of gas thus obtained; so long as any marketable quantity should be secured the rental remained the same. Had the parties intended that the defendant's obligation to sink the well should depend on the prospect of an adequate supply of gas, to be determined by expert opinion, we may presume that it would have been "so nominated in the bond." The only conditional feature anywhere appearing arises from the provision of the original lease limiting payment for gas to the period of its sale; if the third well yielded no gas, none could be sold, and no rental could accrue. But there is no provision for submitting the question of its existence to experts. The contract provided for the sinking of a well, and this is the most convincing method of ascertaining the presence and marketable value of oil or gas. Expert opinions may not be as satisfactory and conclusive of the question as the actual sinking of a well would have been. They have been said to be "to a great degree fanciful, conjectural and speculative:" Duffield v. Rosenzweig, 144 Pa. 520, 539.

The principles governing the determination of cases where the measure of damages has been agreed upon have been fully considered and settled· by the Supreme Court, in Cochran v. Pew, 159 Pa. 184; Gibson v. Oliver, 158 Pa. 277, and other cases there cited, and have been applied by this court in Young v. Gas Co., 5 Pa. Superior Ct. 232. No further discussion of them is here necessary.

When, as in the cases cited, the contract fixes the amount to be paid upon default, this is in the nature of liquidated damages, or a forfeit, which the defaulting party elects to pay in lieu of performance. When, as in the present case, no like· provision is made, the defaulting party must be regarded as

electing to pay the damages actually sustained. The only question here is in relation to the measure of such damages. Performance of the contract by the defendant would have accurately fixed the measure of compensation to the plaintiff. Had the third well been opened, its rental would have been due while it yielded a marketable quantity of gas. Whether it would yield such quantity, and for what period, could be determined with certainty only by the actual opening of the well. The plaintiff was entitled to this performance of the defendant's contract or to its equivalent. The defendant's breach of contract has made it impossible to ascertain the value of performance through the method provided for by the contract. Its value, upon the success of the well, was the rental agreed on. The case is not one in which the plaintiff's claim for compensation may be satisfied by the value of the quantity produced. He was entitled to nothing unless the well yielded a marketable quantity of gas, and the smallest marketable yield entitled him to the full rental. The defendant, having by his default, deprived the plaintiff of the most decisive test,—drilling the well —the value placed on its success may properly be deemed, prima facie, the just measure of compensation for this default. Any uncertainty respecting its accuracy is due to the defendant's wilful neglect of a self-imposed duty upon the faith of which the contract was executed by the plaintiff. It is a familiar principle that upon the suppression or spoliation of evidence by a party, or the failure to produce it when within his control, the jury may presume that its effect, had it been produced, would have been unfavorable to him. On a contract to deliver to plaintiff all the starch made by defendant during the year, the quantity not to exceed 1,000 barrels, at prices depending, within certain limits, on the price of wheat, the defendant having given no evidence of the quantity manufactured or of the prices of wheat during the year, it was held that the jury might assume the fact that he had manufactured 1,000 barrels, and presume most strongly against him as to the price of wheat. "The individual who willfully refuses to fullfil his contract, when able to do so, has no claim to favor at the hands of a jury when brought before them for a breach of it. If, however, he alleges any extenuating circumstances, he must make proof of them, otherwise his allegation ought to be disregarded:" Hubbert v. Borden, 6

Wharton, 79. Here, in the absence of evidence to the contrary, the jury may presume the yield of a marketable quantity of gas up to the commencement of the action, while this presumption may be rebutted by evidence, competent in law, be it expert or other testimony, to show that a third well would not have yielded the quantity of gas required by the contract to entitle the plaintiff to the stipulated rental.

What has been said disposes of the first and third specifications of error. As to the second, the entries in the defendant's book were not, of themselves, evidence of the matters to which they related. The fourth specification need not be considered, since the discretion of the trial court in refusing a new trial is not subject to review here, unless manifest error in its exercise is shown.

Judgment reversed and venire facias de novo awarded.