## C. C. DUFFIELD v. E. P. HUE ET AL.

ERROR TO THE COURT OF COMMON PLEAS OF WARREN COUNTY.

Argued May 8, 1889—Decided November 4, 1889.

[To be reported.]

1. A grant of " the exclusive right and privilege of digging and boring for oil and other minerals," for the term of fifteen years from the date thereof, must be treated as a lease for the production of oil, and not as a sale of the oil or of an interest in the land.

2. While parol evidence is admissible to ascertain the nature and peculiar qualities of the subject matter of a contract, and to show the situation of the parties with respect to it, yet, where there is no latent ambiguity involved, the construction of the contract is for the court.

3. The court not finding either fraud or mistake in the making of an oil-lease, parol evidence offered for the purpose of showing what lands, not embraced in the description, were intended to be included in the grant, is not to be admitted in aid of construction.

4. When the lessor of an oil-lease is dead, and his right, under and subject to it, by his own act or the act of the law has passed to the defendant in an ejectment, who represents his interest in the subject in controversy, neither the surviving party to the transaction sought to be proved, nor the plaintiff in the action, though released by the party offering him, is a competent witness: § 5 (e), act of May 23, 1887, P. L. 158.*

5. It does not follow, that in all cases where a party to an action derives his title through or under a deceased grantor, neither party can be a witness; it is where a party to a thing or contract in action is dead, etc., and a party to the action represents his interest in " the subject in controversy."

* See Palmer v. Farrell, post, 162.

Statement of Facts.

6. As a person cannot be supposed to become a party to a thing or contract in action, until after the thing or contract in action has come into being, this rule of incompetency cannot arise until the thing or contract in action, " the subject in controversy," exists.*

7. Where a contract is partly printed and partly written, the written words are entitled to have greater effect given them in the interpretation of the contract, than those which are printed, for the written words are the terms selected by the parties themselves, to express their meaning in the particular case.

8. The right of the lessor in an oil lease to insist upon a forfeiture by reason of a failure of the lessees to put down a seventh well in a stipulated time, is waived by his acquiescence in the failure to put down two or three of the preceding six wells within the periods stipulated in the lease.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and MITCHELL, JJ.

No. 455 January Term 1889, Sup. Ct.; court below, No. 34 September Term 1888, C. P.

On July 18, 1888, C. C. Duffield brought ejectment against F. P. Hue and D. L. Gerould, for a lot of ground in Clarendon borough, containing about two acres, with three oil wells thereon, part of tract 497, Mead township, bounded, etc., formerly occupied by saw mill and saw mill yard, and part of leasehold granted by Thomas and H. W. Brown to F. M. Pratt, January 20, 1882.

Issue having been joined, on February 12, 1889, an agreement was filed waiving trial by jury and submitting the cause to the decision of the court, under the act of April 22, 1874, P. L. 109.

At the hearing before the court, the plaintiff offered himself as a witness, and also, F. M. Pratt, the lessee in the lease under which plaintiff claimed, the offer of Mr. Pratt being accompanied by releases executed severally by the plaintiff himself, E. O. Emerson and J. A. Neill, "of all liability upon any covenants that may be in his conveyance, or that he may have of any kind against witness by reason thereof."

Objected to, because of the fact that Henry W. Brown had died prior to the bringing of the suit.

---

* See Fross's App., 105 Pa. 258; Warren v. Steer, 112 Pa. 642; Barbour v. Wiehle, 116 Pa. 308.

Decision of Court below.

The court refused the offer of the witnesses to testify as to any matters occurring in the lifetime of Brown.[1]

The testimony of C. B. Crane and L. E. McNett was offered to prove declarations and admissions of Henry W. Brown, made subsequently to the date of the Pratt lease, as to the extent thereof.

On objection made, the court refused the offers.[2 to 6]

On March 19, 1889, the court, BROWN, P. J., filed a decision, which as added to or modified on March 27, 1889, after exceptions filed, was as follows:

FINDINGS OF FACT.

Thomas and Henry W. Brown were the common source of title. Before January 23, 1880, C. R. Elston had given to said Browns a lease for general purposes of the surface of certain land, including that in dispute. On January 23, 1880, William R. Elston and others, heirs at law of C. R. Elston, executed a lease to the said Browns, for the purpose of mining and operating for petroleum, of the same land included in the lease of the surface given by their ancestor. The last mentioned lease was for the term of twenty years, with the superadded agreement of " the right of renewal thereafter so long as oil should continue to be found in paying quantities."

The outlines of the two leases before mentioned, are represented in the map made by E. Gibbs, given in evidence by the plaintiff, to which reference is made; the boundaries being the diagonal line at the left hand of the map, the creek at the bottom, Main street at the top, and the line of R. Thompson and Lapham at the right hand, the R. Thompson line extending only from Main street to the railroad.

Some time before January 20, 1882, the Browns procured a survey to be made, dividing a portion of this before-mentioned territory into village lots. The lots thus surveyed were numbered, and a map of the same made, called the George O. Cornelius survey, to which map reference is made.

On January 20, 1882, the Browns made a lease to F. M. Pratt, of the "exclusive right and privilege of digging and boring for oil and other minerals," on the lands mentioned therein, for the term of fifteen years, to which lease, with its terms and conditions, reference is made. The number of the

tract in the lease as 498, was an admitted mistake, and should be 497. The rights of F. M. Pratt, under this lease, by sundry conveyances and assignments became vested in the plaintiff, C. C. Duffield, on December 14, 1883.

At the time of the execution of the lease from the Browns to Pratt, the Browns had a saw mill, connected with which was a yard for the storage of logs and lumber, the mill and yard occupying about two acres of land, the same being bounded on one side by the railroad, on one side by the Plank road and Brown avenue, and on one side by Exchange street; the location of which two acres is indicated by the Gibbs map before mentioned. They had, so far as appears, no land or interest in the land south of Robert Thompson's line, or south of where an extension of that line across the railroad to the creek would be located. [See infra.]

This ejectment is for the land formerly occupied by the saw mill and saw mill yard. The plaintiff claims that the land described in his writ was included in the lease now held by him, given by the Browns to Pratt, and that he is entitled to the possession for the purposes of operating and procuring petroleum and other minerals under the terms of that lease.

The defendants claim that the Pratt lease does not include the land for which the ejectment is brought, and assert their right of possession under the following facts, viz.:

Henry W. Brown assigned his interest in the lease of Wm. R. Elston et al. to Thomas and himself, to Thomas Brown. Afterwards, on judgments against Thomas, executions were issued. On these executions said lease was levied upon with other property, and on June 8, 1885, the personal property, including the lease, was sold at sheriff's sale. The return of the sheriff set forth that he had sold the personal property as per levy to " sundry bidders " for an aggregate sum. From parol evidence introduced by defendants, it is found that the lease in question was sold by the sheriff to L. Rosenzweig. On January 16, 1886, L. Rosenzweig executed a lease to the defendants, F. P. Hue and D. L. Gerould, for oil and mineral purposes, which lease is for the two acres, the land in suit, and under which defendants are in possession and reference to which lease is made.

Defendants further claim, that if the land in dispute is, as

claimed by the plaintiff, included in the lease from the Browns to Pratt, Pratt and the plaintiff under him have, under the terms of the lease, forfeited all right to that portion of the territory which is in controversy in this suit, by failure to drill or bore the seventh well as provided by the lease. As bearing on this claim, it is found as a fact that said seventh well was not put down or commenced until about the spring of 1886, and after the defendants had commenced operations under their lease from Rosenzweig; and we fail to find that either the Browns or Rosenzweig said or did anything waiving their right to claim a forfeiture. [See infra.]

During the year 1882, and continuously since, paying, producing oil wells have been in operation on the premises mentioned in the lease to Pratt. Six wells were put down by Pratt or his grantees before the sheriff's sale of June 8, 1885, when Rosenzweig became the purchaser of the lease, but none of those wells were on the land in controversy. Excepting the testimony of F. M. Pratt and the plaintiff Duffield, as to transactions between them and Henry W. Brown, in his lifetime, there is no evidence that any one of the six wells was drilled after the time stipulated in the lease. [See infra.] Henry W. Brown died about the month of August, 1885.

[March 27, 1889.]

At the request of plaintiff the following additional facts are found:

1. That the lease from Thomas and Henry W. Brown was written on a printed blank used by Thomas Brown in making leases on No. 498, which said Thomas owned.

2. The finding of fact that Thomas and Henry W. Brown, at the time of the lease to F. M. Pratt, "had, so far as appears, no land or interest in land south of Robert Thompson's line, or south of where an extension of that line across the railroad to the creek would be located," is modified to read as follows, viz.: They had, so far as appears, no land or interest in land south of Robert Thompson's line, adjoining the Cornelius survey, or south of where an extension of that line across the railroad to the creek would be located; but they did have land lying south of the Thompson land and south of Erie street, as represented on the Gibbs map, given in evidence by the plaintiff, on which they had oil wells.

3. So much of the findings of fact as says, " we fail to find that either the Browns or Rosenzweig said or did anything waiving their rights to claim a forfeiture," and so much as says, " excepting the testimony of F. M. Pratt and the plaintiff, Duffield, as to transactions between them and Henry W. Brown in his lifetime, there is no evidence that any one of the six wells was drilled after the time stipulated in the lease " are stricken out.

4. We find that two, and probably three of the six wells, put down by F. M. Pratt and his grantees, were put down after the time stipulated in the lease; and there is no evidence showing any claim of forfeiture by the lessors by reason of the failure to comply with the terms of the lease in that respect.

5. Some of the wells drilled by the lessees were not on the village lots mentioned in the lease, but were changed to other localities, either by agreement, or by the act of the lessee, acquiesced in by the lessor.

6. By agreement of counsel, the testimony of F. M. Pratt, taken before the master in the equity case between the parties, is to be treated as if taken after the execution of the releases given in evidence by the plaintiff.

At request of defendants the following additional facts are found, viz.:

On February 13, 1886, L. Rosenzweig gave to the plaintiff verbal notice that in consequence of the non-performance of the covenants in the lease from the Browns to F. M. Pratt, the right of the plaintiff to put down more wells had ceased. This was on the day that the lease from Rosenzweig to defendants was acknowledged, and on March 16, 1886, he gave him a written notice not to drill any other or further oil wells on the territory bought by him at sheriff's sale.

PLAINTIFF'S POINTS [inter alia]:

1. Under the terms of the grant by Elston's heirs to Thomas Brown and Henry W. Brown, it was provided that in case oil was found in paying quantities upon the premises within twenty years, the estate of the grantees should then continue as long as oil should be produced thereon; and under the admissions of the defendants, there having been prior to June 1, 1885, six oil wells producing oil in paying quantities, such grant to T. and H. W. Brown created in them a freehold estate for life, or conditional fee, and the alleged sale of said estate as personalty

by the sheriff under a writ of fieri facias to Rosenzweig, on June 8, 1885, passed to him no title to the reversion in the premises demised to Pratt, and Rosenzweig could not, therefore, enforce any forfeiture of the plaintiff's estate.

Answer: Refused.[8]

2. According to the terms of the lease to F. M. Pratt, under which the plaintiff held, and under which it is admitted six paying, producing oil wells had been drilled on the premises, it is provided that before any forfeiture therein provided for could be declared or enforced against the lessee or his assigns, the lessor or his assigns should survey and set apart "all of the demised premises," along with such producing oil wells, to the said lessee; this surveying and setting apart of such demised premises as were thus excepted from the operation of the forfeiture, became a condition precedent to be performed by the lessor or his assigns before such forfeiture could be enforced; and there being no evidence of the performance of this condition precedent, there has been no such forfeiture of the demised premises, or any part thereof, as prevents the plaintiff from recovering in this case.

Answer: Refused.[9]

11. The lease of January 20, 1882, from Thomas and H. W. Brown to F. M. Pratt, under which the plaintiff claims possession of all the land therein demised, must be construed most strongly against the lessors and in favor of the lessees, and under its terms is a grant by said lessors of all their land in tract No. 497, to the Robert Thompson line on the south, including the so-called mill-yard, now occupied by defendants with their oil wells; and it is not competent to show by parol evidence that said mill-yard or any part of the demised premises was excepted or omitted from said lease, except from some fraud, accident or mistake occurring at the time the lease was made, of which there is no allegation or evidence in this case.

Answer: The eleventh point is affirmed, with the exception of so much of it as asserts that under its terms the lease "is a grant by the lessors of all their land in tract No. 497, to the Robert Thompson line on the south, including the so-called mill-yard, now occupied by the defendants with their oil wells.[10]

12. To make parol evidence competent in this case, to except the mill-yard from the grant in the Pratt lease, the allegation

of fraud, accident or mistake in the making of said lease, must be supported by direct and positive evidence, clearly preponderating; and the uncontradicted evidence of F. M. Pratt, L. E. McNett and C. B. Crane, shows that H. W. Brown with whom Pratt made his contract, intended the mill-yard to be included in the lease.

Answer: This is affirmed, with the exception of so much of it as claims that the evidence of those persons named shows that Henry W. Brown intended the mill-yard to be included in the lease.[11]

DEFENDANTS' POINT [inter alia]:

2. That the sale by the sheriff to Louis Rosenzweig, of the premises covered by said Elston lease, on June 8, 1885, conducted with all the formalities and with the proper notice to validate a sale of a chattel real, passed to Rosenzweig a good title to said leasehold. That such title passed to him by such sale, without deed or other written evidence of title, and that parol evidence is admissible to designate to whom the property was in fact sold.

Answer: Affirmed.[12]

CONCLUSIONS OF LAW.

We decide this case upon the two propositions indicated in the findings of fact and the answers to the points: First, Does the lease from Thomas and Henry W. Brown to F. M. Pratt include the land in suit? and, second, if it does, then are the rights of the plaintiff, the grantee under such lease, forfeited?

[We reject the parol evidence on both sides, offered for the purpose of showing what land was intended to be included in the lease, except so much as shows the situation of the parties with respect to the premises at the time it was made.] [7] We reject the testimony of F. M. Pratt and the plaintiff Duffield, as to matters occurring between them and Henry W. Brown, Brown having been dead, and his rights to the thing or contract in action having passed to the party on the record who represents his interest.

[We construe the lease to grant only the right to "dig and bore for oil and other minerals" on certain designated sites or village lots, numbered on the map of George O. Cornelius survey, by the numbers 151 Mill street, 193 Centre street, 160 Elston street, and 134 Elston street, with sites for three wells

situate on plot No. 1 on the south side of the Philadelphia and Erie railroad, at locations to be thereafter agreed upon by the parties.] [13]

[It is difficult to ascertain why the words " it is understood that this lease includes no land south of Robert Thompson's line " were inserted. But whatever the purpose was, the language used is negative in character, and does not indicate an intention in the grantors to include in the lease all the land bounded on the one side by the Thompson line, or what is the same thing, all the land included in the George O. Cornelius survey. It is true, that if possible all the words used in a written agreement should be regarded, and effect given to them. But this rule invoked by the plaintiff would be violated if we should do what in effect he asks us to do; namely, to hold that the specific locations of the oil well sites, as set out in the lease, are without significance.] [14] [From the fact that the Cornelius survey only reached to the Thompson line, and that the Browns had no land adjoining that survey on the south; from the fact that the Browns at the time of the lease had a saw mill on the land in suit in operation, and were using the mill-yard for the storage of logs and lumber, and from the hazard to which the mill and lumber would be subjected by oil wells in the mill-yard, we are inclined to regard the words, " this lease includes no land south of Robert Thompson's line " as surplusage, or at least that they are not operative to include the land in dispute within the lease, whatever other effect they may have been intended for.] [15]

We further find that whatever right the lessors may have had to insist on a forfeiture of the Pratt lease, by reason of failure to put down the seventh well within the stipulated time, was waived by their acquiescence in the failure to put down two or three of the preceding six wells within the stipulated times. We are of the opinion that the lessee might well believe from such acquiescence, that strict performance of the terms of the lease, as to the time of putting down the wells, would not be insisted on, and that a reasonable notice should be given before a forfeiture could be claimed on account of failure to sink the seventh well.

The parties having stipulated in the agreement to waive jury trial and submit the cause to the court, that the excep-

tions to the decision of the court upon the facts and the law should be filed within five days, otherwise be disregarded, it is now ordered that if no exceptions to the findings of fact or conclusions of law shall be filed within five days after service of notice of this decision on the parties or their attorneys, judgment shall be entered for defendants for the land described in the writ.

On March 27, 1889, certain exceptions having been overruled, and others sustained, and the decision modified so as to be as presented above, judgment was entered in favor of the defendants,[16] when the plaintiff took this writ, assigning as error :

1–6. The refusal of the plaintiff's offers.[1 to 6]

7. The conclusion of law embraced in [ ] [7]

8–11. The answers to plaintiff's points.[8 to 11]

12. The answer to defendants' point.[12]

13–15. The conclusions of law embraced in [ ] [13 to 15]

16. The order entering judgment for defendants.[16]

*Mr. Samuel T. Neill* (with him *Mr. W. M. Lindsey*), for the plaintiff in error :

1. Under the act of April 15, 1869, P. L. 30, the competency of both Pratt and the plaintiff Duffield, as against the defendants, was not affected by the death of H. W. Brown : McFerren v. Iron Co., 76 Pa. 180 ; Evans v. Jenks, 9 W. N. 139 ; McLaughlin v. Fulton, 104 Pa. 169 ; Warren v. Steer, 112 Pa. 642. Under the authority of Warren v. Steer, last cited, there can be no question as to the competency of Pratt as a witness. The case of Fross's App., 105 Pa. 258, relied upon by defendants' counsel, has no application here, as is clearly pointed out in Warren v. Steer. That Karns v. Tanner, 66 Pa. 297, also cited and relied upon in the court below, has no application, is seen by the plain distinction between the parties to the record in that case and the one at bar.

2. But if Pratt was incompetent under the act of 1869, or the act of May 23, 1887, P. L. 158, if disqualified on the ground of interest, not being a party to the suit, that disqualification was removed by the release from the plaintiff : McFerren v. Iron Co., 76 Pa. 180 ; Summers v. Wallace, 9 W. 161 ; Evans

v. Jenks, 9 W. N. 139; Rhines v. Baird, 41 Pa. 256; Wright
v. Funck, 94 Pa. 26.   The act of 1887 has not only extended
the rule of competency, but has provided a plain rule to deter-
mine the question.   If, however, there were any doubt as to
the competency of Pratt under § 5, clause (e) of the act of
1887, it was removed by the release to him from plaintiff under
§ 6 of that act, which release was admitted without objection.

3.  Declarations made by Brown in his lifetime and the testi-
mony of McNett and Crane, should have been admitted to show
the situation of the parties at the time the lease was executed.
There was also a latent ambiguity in the lease which required
this evidence to explain it.   That part of the lease which was
in writing, inserted by the parties, was applicable to land in
497; that which was printed, was not.   Parol evidence was
therefore indispensable to apply the vague and conflicting de-
scriptions in the lease to the land that was intended to be
leased : Broom's Legal Maxims, 590 ; Troup v. Troup, 87 Pa.
149; Taylor on L. & T., § 160.

4.  The error into which the court fell in construing the lease
was in making the written clauses of it give way to the print-
ed provisions found in a blank form used for tract 498, and thus
certain expressions applicable alone to a lease on that tract were
allowed to control in the interpretation of the present lease.
The rule of law which attaches more relative importance to
the written part of a contract than to the printed matter, is
well settled : Haws v. Fire Ass'n, 114 Pa. 431; Grandin v. In-
surance Co., 107 Pa. 26 ; Harper v. Insurance Co., 22 N. Y.
443.

*Mr. Charles Dinsmoor* (with him *Mr. James Cable*), for the
defendants in error :

1.  Pratt and Duffield were incompetent witnesses under the
ruling of Karns v. Tanner, 66 Pa. 297, which was almost the
counterpart in its facts to the present case.   See also, Fross's
App., 105 Pa. 258; Arthurs v. King, 84 Pa. 525 ; Murray v.
Railroad Co., 103 Pa. 37.   And the court ruled out both
plaintiff's and defendants' parol testimony, offered to affect
the descriptive portion of the lease, for the very satisfactory
reason that it found no fraud, accident, mistake, ambiguity or
omission, in that portion of the lease, upon which to ground a
modification or re-formation of it.

2. A grant, under seal, to persons, their heirs and assigns, of the exclusive right to bore for oil or minerals on premises owned in fee by the grantor, to have and to hold, etc., "for twenty years, or so long as the parties use it for the purpose of producing oil, or minerals, or gas," passes only a leasehold estate: McElwaine v. Brown, 9 Cent. R. 789; Homer v. Leids, 2 Shars. & B. L. C. 306. An oil leasehold for a definite term of years is a chattel real, and may be levied on and sold as such under a fieri facias ; and parol evidence is admissible to help out omissions in the sheriff's return, by defining what was sold, and to whom it was sold: Titusville Nov. I. W.'s App., 77 Pa. 103 ; Sowers v. Vie, 14 Pa. 99 ; Scott v. Sheakly, 3 W. 50 ; Shoemaker v. Ballard, 15 Pa. 92.

OPINION, Mr. JUSTICE CLARK:

This is an ejectment, brought in the Court of Common Pleas of Warren county by C. C. Duffield against F. P. Hue et al., to recover the possession of a lot of ground containing two acres, more or less, in Clarendon. The lot is conceded to have been part of tract No. 497, in Mead township, of which tract C. R. Elston was the owner, and this is the common source of title. On January 23, 1880, Elston's heirs leased part of tract 497, including the lands in dispute, to Thomas and Henry Brown, for oil-mining purposes; and on January 20, 1882, the Browns sublet to F. M. Pratt. The whole controversy arises upon the proper construction of the last mentioned lease. The plaintiff's contention is, that although, upon a literal and strict reading of this lease, it might appear merely to designate certain sites upon which Pratt was privileged to operate for oil, yet his rights really extended to all that part of tract 497 covered by the Elston lease of January 23, 1880, and to all the underlying minerals. In order to establish this, he introduced parol evidence of the declarations and admissions of Henry W. Brown, made subsequently to the date of the Pratt lease, as to the extent thereof, and by this means sought to modify the descriptive parts of the lease so as to include the mill-yard, which is the premises in dispute. Duffield, the plaintiff, offered himself as a witness, and called F. M. Pratt, both proposing to testify as to matters occurring between them and Henry W. Brown, who died prior to the bringing of this suit. The learned judge

of the court below, admitting the evidence which exhibited the situation of the parties with reference to the premises at the time the lease was made, rejected all parol proof offered for the purpose of showing what lands, not embraced in the description, were intended to be included in the lease; and also the evidence of Pratt and Duffield as to matters occurring in the lifetime of Brown. The first seven specifications of error are directed to these rulings of the court.

The lease from Brown to Pratt, as we have said, was made January 20, 1882, and the plaintiff has succeeded to the rights of Pratt and Duffield. After the assignment of Pratt's interest to Duffield, the interest of the Browns was sold at sheriff's sale, and purchased by one Rosenzweig, who on January 16, 1886, executed a lease to the defendants, Hue and Gerould. Thus it appears that the rights of the present parties are wholly dependent upon the terms, conditions, and proper construction of the lease from the Browns to Pratt, dated January 20, 1882. H. W. Brown died about the month of August, 1885.

The act of May 23, 1887, provides that "where," etc., "any party to a thing or contract in action is dead," etc., "and his right thereto or therein has passed, either by his own act or by the act of the law, to a party on the record, who represents his interest in the subject in controversy," neither "any surviving or remaining party to such thing or contract, nor any other person whose interest shall be adverse to the said right of such deceased party, shall be a competent witness to any matter occurring before the death of said party," etc., "unless," etc. The thing in action here is the plaintiff's right to the possession of the premises in dispute under the lease of January 20, 1882. W. H. Brown was party to that lease, and his right, under and subject to it, by his own act or the act of the law, has passed to the present defendants, who represent his interest in the subject in controversy; and, as Brown is dead, it would appear to follow from the provisions of the act of May 23, 1887, however it might have been before the passage of that act, that Pratt, the surviving or remaining party, was not a competent witness to any matter occurring before Brown's death. The policy of the statute is to prevent inequality, and it is upon the ground of policy, and not interest, that Pratt is incompetent.

It does not follow, however, that in all cases, if a party derives his title through or under a deceased grantor, however remote, neither party can be a witness; for this, in the trial of an ejectment, would be a practical exclusion of the parties; it is where a party to a thing or contract in action is dead, etc., and another represents his interest in " the subject in controversy." This rule of incompetency cannot arise until the thing or contract in action exists; for a person cannot be supposed to become a party to a thing or contract in action, until after the thing or contract in action has come into being. The subject in controversy in this instance originated in the execution of the lease; and the plaintiff's right under that lease, as we have said, is the thing or contract in action. It was Brown's right in his lifetime, as it is the defendants' right now, to stand upon the terms of that lease; and as Brown's interest then was adverse to the plaintiff's claim now, to wit, that the lease did not set forth the contract of the parties, the policy of the statute must be held to apply; and, as Pratt's incompetency does not arise out of his present interest, and Duffield was himself a party to the suit, the releases were of no avail to remove their disqualification.

Nor do we think the court erred in rejecting the parol evidence of other witnesses offered for the purpose of showing, in modification of the description, what land was intended to be included in the lease. This evidence on part of the plaintiff consisted largely of loose declarations of H. W. Brown, as to what lands had been leased to Pratt. The learned judge of the court below, to whom the case was referred under the act of 1874, did not find any fraud or mistake in the making of the lease; nor is there any evidence to support it if there had been any such finding. Indeed, we do not understand that either fraud or mistake is alleged. It was competent, of course, by parol evidence, to ascertain the nature and peculiar qualities of the subject of the contract, and to show the situation of the parties with respect to it; but, as there was no latent ambiguity in the contract, its construction was for the court. The lease itself is not only the best, but the only, evidence of the agreement of the parties; for whatever Brown may have said at various times as to the extent of the lease, and whatever his motives may have been for so saying, its actual extent

must be ascertained from the language of the lease, which must be assumed to contain the deliberate and final engagements of the parties. The lease consists partly in a printed formula, prepared for oil leases on the tract 498, and partly in written words inserted therein; and the printed number, 498, it is conceded should have been changed to 497. It is undoubtedly true that in such case the written words are entitled to have greater effect in the interpretation than those which are printed, for the written words are the terms selected by the parties themselves to express their meaning in this particular case; whereas the words of the printed form are of a more general character, originally chosen for application to similar subjects only, and frequently, as in this case, are, by necessary alterations and changes, made to express, as near as may be, the intention of the parties: Grandin v. Insurance Co., 107 Pa. 31; Haws v. Association, 114 Pa. 431. Whilst, by the printed form, the leased premises are described as " a certain lot or piece of land situate," etc., it is plain from the written clauses that the premises were to be operated at certain designated points or " sites " only. These sites are specifically described as follows : " Each site situated on lots numbered, respectively, on map, one fifty-one Mill street, one ninety-three Center street, and one sixty and one thirty-four on Elston street; and also sites for three wells, situate, per plot No. one, south side of Philadelphia & Erie Railroad, to be designated and mutually agreed upon by both parties." The rights of Pratt as lessee for oil-mining purposes are plainly restricted to these sites. It is provided that he is to have the privilege of drilling other wells on the same premises only in the event that the Browns might determine to have more wells drilled, and then the operations were to be conducted on the same terms. Whilst the lease, in some sense, may be said to cover the entire lot for oil-mining purposes, yet it is plain that operations were restricted to the sites mentioned.

Whatever oil might be produced from the premises leased at these points, the lessees had a right to produce; but they had no right of possession, for any purpose, at any other place within the bounds of the territory described. If the lessors, or others acting under them, by boring other wells, lessened this production, or otherwise disturbed or interfered with the rights

of the lessees, they may have had their remedy, but not in this form; for by no construction of the contract in question can Pratt be supposed to have had any right of possession, for any purpose, in any part of the premises in dispute; and Duffield, in his right, has therefore no standing to recover in ejectment.

Upon the question of forfeiture, we think the views expressed by the court are correct: " Whatever right the lessors may have had to insist on the forfeiture of the Pratt lease by reason of failure to put down the seventh well within the stipulated time, was waived by their acquiescence in the failure to put down two or three of the preceding six wells within the stipulated time. . . . . The lessee might well believe, from such acquiescence, that strict performance of the terms of the lease as to the time of putting down the wells would not be insisted on, and that a reasonable notice should be given before a forfeiture could be claimed on account of failure to sink the seventh well." The writing of January 20, 1882, from what has been said, must be treated as a lease for production of oil, and not a sale of the oil or of the land, and the defendants had a right to stand upon their title.

The judgment is affirmed.