C. C. DUFFIELD v. L. ROSENZWEIG.

APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS OF WARREN COUNTY.

Argued May 8, 1891—Decided October 26, 1891.

[To be reported.]

1. Where a lease for oil purposes granted to the lessee a certain tract of land, with the exclusive right of boring for oil thereon, but restricted the operations of the lessee to certain specified sites, the lessee had no such possession as would support ejectment as to land outside the sites designated: Duffield v. Hue, 129 Pa. 94.

2. The lessee, however, had the protection of the entire leasehold; and

Statement of Facts.

equity had jurisdiction to restrain the lessor, or others acting under him, from drilling wells thereon outside the designated sites and thereby lessening the production of the lessee's wells, such injury being without adequate remedy at law: Duffield v. Hue, 136 Pa. 602.

3. But, when wells have been drilled on the leasehold outside the sites designated, either by the lessor, or by those acting under him under a subsequent lease, the jurisdiction in equity does not oust the jurisdiction at law, and the first lessee may have a remedy at law against the lessor * to recover damages actually sustained by him from such drilling.

4. In such case, the damages are not to be measured by the amount of oil taken out of the defendant's wells so drilled, nor by the speculative opinions of operators as to how much of it might have been obtained through the plaintiff's wells, but they may be measured by the difference in value of the plaintiff's leasehold, before and after the injury was committed.

5. By the procedure act of May 25, 1887, all distinctions between trespass and case, so far as they relate to procedure, were abolished; and, though the plaintiff's statement sets forth his claim in trespass, yet if the facts in evidence on the trial show that he is entitled to recover in either form of action, he is entitled to have judgment.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and McCOLLUM, JJ.

No. 437 January Term 1891, Sup. Ct.; court below, No. 69 December Term 1889, C. P.

On November 21, 1889, Charles C. Duffield brought trespass against Louis Rosenzweig, filing a statement of claim setting out in its first count a certain lease for oil purposes, executed on January 20, 1882, by Thomas and Henry W. Brown to F. M. Pratt, shown in the decision of the court below, and proceeding:

" That, by the terms of said lease, said Pratt and his assigns became bound to drill seven wells at certain designated localities upon said demised premises, which were deemed sufficient in number to exhaust all the oil in and under said demised premises, by pumping or causing the oil to flow through the sand rock in which said oil was deposited, and if it was determined that other wells were necessary to be drilled, said lessee or his assigns were to have the right to drill such additional wells;

---

* See McCloskey v. Powell, 123 Pa. 62; McCloskey v. Powell, 138 Pa. 383.

Statement of Facts.

that by divers conveyances the right, title and interest of said F. M. Pratt became vested in said plaintiff; that, in the month of February, 1886, the plaintiff and those to whose rights he had succeeded, had drilled and bored at great expense, to the oil-bearing sand rock, six wells on said demised premises, and said plaintiff was then preparing and about commencing to drill the seventh well on said demised premises; that the value of said wells so drilled and about to be drilled depended upon the extent of the oil-bearing sand rock from which the oil could be pumped, drawn or caused to flow through said wells; that said defendant knew at the time of the wrong and injury hereinafter complained of, that each of said wells so drilled or about to be drilled would, from the flow of gas through the oil-bearing sand rock, draw out and exhaust all the oil in the sand rock underlying four or five acres of said surface around said wells, and that said wells, from their location about and around a certain piece of land within said demised premises known as the mill-yard, containing about two acres, would within the term of said plaintiff's lease entirely draw out and exhaust the oil in the said rock underlying said mill-yard; nevertheless, although said defendant knew that said plaintiff had the right to pump out and exhaust and draw all the oil underneath said mill-yard, yet in said month of February said defendant with force and arms, at the county aforesaid, and intending maliciously to defraud and injure said plaintiff, by himself, his agents, servants and tenants entered upon said premises, to wit, said mill-yard, and has drilled or caused to be drilled three oil wells to said oil-bearing sand rock, with the intention and purpose of taking away from said plaintiff's wells the oil that of right belonged to plaintiff and which oil during the term of said lease would have flowed and been caused to flow through said plaintiff's wells and been removed by said plaintiff and thus have become a source of profit, and the said defendant has thereby interfered with and disturbed said plaintiff in his right to pump oil through his (said plaintiff's) wells, and has by lessening and interrupting the flow of gas damaged the plaintiff's wells; that the amount of oil which said defendant has caused to be diverted from said plaintiff's wells and brought or drawn from said oil-bearing sand rock through said three wells, so as aforesaid wrongfully and unlawfully drilled in said mill-yard by said defendant and his

Decision of Court below.

agents, servants and tenants, has been upwards of six thousand barrels of crude oil, of the value of eight thousand dollars; and the damage suffered by said plaintiff, in the loss of gas in his said wells and the other wrongs and injuries done or caused to be done by said defendant to said wells, has been two thousand dollars."

The defendant having pleaded not guilty, on February 22, 1890, an agreement was filed submitting the cause to the decision of the court without a jury, under the provisions of the act of April 22, 1874, P. L. 109.

On December 31, 1890, MORRISON, J., 48th district, filed a decision as follows:

FINDINGS OF FACT.

C. R. Elston was the common source of title. Prior to January 23, 1880, C. R. Elston had executed and delivered to Thomas and Henry W. Brown a lease for general purposes of the surface of certain land, including that upon which the oil wells were sunk and operated that gave rise to this suit. On January 23, 1880, W. R. Elston and others, heirs at law of C. R. Elston, executed and delivered a lease to the said Browns, for the purpose of mining and operating for petroleum, of the same land included in the lease of the surface given by their ancestor, C. R. Elston. The last mentioned lease was for the term of twenty years.

On January 20, 1882, the Browns made a lease to F. M. Pratt, of the " exclusive right and privilege of digging and boring for oil and other minerals " for the term of fifteen years. This lease as to description of property, etc., was as follows:

" All that certain ·lot or piece of land, situated in the township of Mead, county of Warren and state of Pennsylvania, bounded and described as follows, viz. : Being a part of tract number four hundred and ninety-eight, according to George O. Cornelius' survey, and containing an area of ——, according to a division of said tract into numbered sites, made by said first party, *each site situated on lots numbered respectively on map one hundred and fifty-one Mill street; one hundred and ninety-three Centre street, and one hundred and sixty and one hundred thirty-four on Elston street, and also sites for three wells situated per plot number one, south side of Philadelphia & Erie*

*R. R., to be designated and mutually agreed upon by both parties. . . . . It is understood that this lease includes no land south of Robert Thompson's line; and further, said party of the second part to have the privilege of drilling on premises hereinbefore mentioned, other wells, if said parties determine to have more wells drilled, at the same terms and conditions mentioned in this lease.*"

The words in italics were written in the lease.

It was then provided that work on the first well should begin in thirty days, on the second within thirty days after completing the first, and on the third and each succeeding well within sixty days after the completion of the well next preceding. The lease then continued:

"It is further agreed by and between the parties hereto, that in case of suspension, either in drilling any well provided for herein, or in working the same after oil shall be found, for a space of thirty days, at one time, or of the failure of the said party of the second part, his legal representatives and assigns, to comply with any one of the reservations, conditions, or agreements herein contained, and which, on his part, are to be observed, kept and performed, then and in that case it shall be deemed an abandonment of the same and a relinquishment and forfeiture of all rights under this agreement; and the said party of the first part, their heirs, legal representatives and assigns, shall have the right to enter upon and take possession of the premises hereby leased without recourse to law, and in as full and ample a manner as if this lease had never been made, time being of the essence of this contract. Or, the party of the first part may thereupon cause a notice to be left or posted on the premises, of an intention to determine this lease; and at the expiration of thirty days from the time of so leaving such notice, this lease shall absolutely determine," etc.

Henry W. Brown assigned his interest in the lease of William R. Elston and others to Thomas and himself, to Thomas Brown. Afterwards, on judgments against Thomas Brown, executions were issued, and on these executions said lease was levied upon, with other property, and on June 8, 1885, was sold by the sheriff to Louis Rosenzweig, the defendant. On January 16, 1886, Rosenzweig executed a lease to F. P. Hue and D. L. Gerould, for oil and mineral purposes, which lease was for

Decision of Court below.

about two acres of the land leased by the Elstons in tract No. 497, known in this controversy as the "mill-yard." The Elston lease designates this land as in No. 498, which is a clerical mistake, the correct number being beyond all question No. 497. It was upon this mill-yard lot that Hue and Gerould, under their lease from Rosenzweig, produced the oil which gave rise to this suit.

This oil was mined and produced by Hue and Gerould, between the date of their lease of January 16, 1886, and January, 1890, under and by virtue of this lease. The amount of oil so produced was 8253 barrels, of the value at the commencement of this suit of eight thousand dollars. This is the only measure of damages proved in this suit, if, under the law applicable to the facts, this is a proper measure.

Neither F. M. Pratt, nor the plaintiff C. C. Duffield, his assignee, were ever in possession of the mill-yard property. And that part of tract No. 497 known as the mill-yard, was never divided by the Cornelius survey, or mapped or plotted into numbered sites, and there were no sites or locations fixed thereon for the drilling of oil wells.

The defendant, Rosenzweig, did not sub-lease the mill-yard to Hue and Gerould, for oil purposes, until after the plaintiff had informed him that he would not put down any more wells under the Brown-Pratt lease, upon the terms thereof. But Rosenzweig afterwards told the plaintiff that he might put down the seventh well. The lease from Rosenzweig to Hue and Gerould, under which they produced the oil in controversy in this suit, specifically stated that Rosenzweig only transferred to Hue and Gerould such rights as he acquired by the sheriff's sale of the Brown interest. Rosenzweig's possession of the mill-yard property was by virtue of the sheriff's sale of the interests of Thomas and Henry W. Brown, June 8, 1885 ; the Browns being the lessors in the Brown-Pratt lease, under which the plaintiff bases his right of action.

The evidence on the part of the plaintiff does not show specifically what damage, if any, was caused to the plaintiff's wells by the wells drilled and operated on the mill-yard lot by the lessees of the defendant. Several other wells were operated near the plaintiff's wells, besides those drilled by Hue and Gerould on the mill-lot, and all these wells affected the production,

Decision of Court below.

more or less, of plaintiff's wells; and it is impossible, from the evidence submitted, to find how much of the oil produced by Hue and Gerould, on the mill-lot, would have been produced by the plaintiff's wells, if the Hue and Gerould wells had not been operated on the mill-lot.

The defendant received but one eighth of the oil taken out of the mill-lot by Hue and Gerould, which was a less amount than he would have been entitled to receive if the plaintiff had drilled and operated the wells under the provisions of the Brown-Pratt lease.

We find that the title to the lease from Browns of January 20 1882, to F. M. Pratt, as to Pratt's interest therein, had vested in the plaintiff prior to the defendant acquiring any interest in the property. And it is conceded by all parties to this suit that the plaintiff's title to said lease is good, except it is contended by the defendant that the plaintiff forfeited his right to put down the seventh well, and that the Pratt lease did not cover the mill-yard leased by the defendant to Hue and Gerould.

The evidence offered by the plaintiff is insufficient to show fraud or mistake in the description of the Brown-Pratt lease, except as to the figures 498, which should read 497. Otherwise, this testimony is only considered in so far as it throws any light on the situation of the parties at the time the lease was made.

We find that several of the wells drilled by Pratt and his grantee were not drilled till after the time stipulated in the lease, and there was no claim or notice of forfeiture until February, 1886, when Rosenzweig gave plaintiff notice that his right to put down wells had ceased.

### CONCLUSIONS OF LAW.

In the language of Judge Brown, in Duffield v. Hue, 129 Pa. 94, we are of the opinion that "whatever right the lessors may have had to insist on a forfeiture of the Pratt lease, by reason of failure to put down the seventh well within the stipulated time, was waived by their acquiescence in the failure to put down two or three of the preceding six wells within the stipulated time. We are of the opinion that the lessee might well believe from such acquiescence, that strict performance of the terms of the lease as to the time of putting down the wells

would not be insisted on, and that a reasonable notice should be given before a forfeiture could be claimed on account of failure to sink the seventh well." Moreover, Rosenzweig expressly says in his testimony that he was willing for Duffield to put down the seventh well. We therefore hold that there was no forfeiture of the Pratt lease. [We further follow the construction of Judge Brown of the Pratt lease, viz. : "We construe the lease to grant only the right to ' dig and bore for oil and other minerals' on certain designated sites of village lots, numbered on the map of George O. Cornelius' survey by the numbers 151 Mill street, 193 Centre street, 160 Elston street and 134 Elston street, with sites for three wells, situate on plot No. 1, on the south side of the Philadelphia & Erie Railroad, at locations to be thereafter agreed upon by the parties."] [2] So much of Judge Brown's construction of this lease was af firmed by the Supreme Court in Duffield v. Hue, supra. In that case Justice CLARK on page 108 says : " The rights of Pratt, as lessee for oil-mining purposes, are plainly restricted to these sites. It is provided that he is to have the privilege of drilling other wells on the same premises, only in the event that the Browns might determine to have more wells drilled, and then the operations were to be conducted on the same terms. Whilst the lease, in some sense, may be said to cover the entire lot for oil-mining purposes, yet it is plain that operations were restricted to the sites mentioned. Whatever oil might be produced from the premises leased at these points, the lessees had a right to produce ; but they had no right of possession, for any purpose, at any other place within the bounds of the territory described. . . . . By no construction of the contract in question can Pratt be supposed to have had any right of possession, for any purpose, in any part of the premises in dispute ; and Duffield, in his right, has therefore no standing to recover in ejectment."

In Duffield v. Hue, 136 Pa. 602, the same justice, speaking for the court, reasserts what is above quoted, and in addition says on page 617 : " The defendants, having taken possession of the mill-site for the purpose of boring for oil, could not be dispossessed by ejectment, nor was trespass an adequate remedy. It was, without doubt, proper for the plaintiff, if his claims are justified by the proofs, to resort to equity for redress. The

Decision of Court below.

injury threatened was of a permanent nature, and destructive of his rights under the Pratt lease. The damages anticipated were incapable of measurement at law. The court below had undoubted jurisdiction for the prevention and restraint of the defendants, and for redress of the injuries suffered."

[We are bound by the construction of the Pratt lease given to us by the Supreme Court, in the above cases; and, it having been determined that neither Pratt, nor Duffeld his assignee, had any right of possession of the mill-yard or site, for any purpose, we are unable to see how the plaintiff can maintain this action of trespass quare clausum fregit, for the recovery of the damages caused to his oil right under his Brown-Pratt lease.] [3] It was argued in this case that since the procedure act of May 25, 1887, P. L. 271, a recovery may be had in trespass for a cause of action which would formerly have been case. This is true. But, when a plaintiff states his cause of action so that it appears to be in trespass quare clausum fregit, he is still bound to support it by competent evidence. [An inspection of the first count of the plaintiff's statement of his cause of action, forces us to the conclusion that he cannot recover without proof of possession, or the right of immediate possession of the mill-yard lot. And we have already seen that he neither had the actual possession, nor the right of possession of the mill-yard for any purpose.] [4]

[The injury, if any, was caused by Hue and Gerould operating the mill-yard under their lease from the defendant, and for this injury the equity suit reported in 136 Pa. 602 is now pending in Warren county Court of Common Pleas ; and, the Supreme Court having determined that this suit in equity is the proper and adequate remedy, we think the plaintiff is bound to pursue that suit to the end.] [5]

[In addition to what has been said, the damages claimed in this suit seem to us incapable of proper measurement at law.] [6] If we find for the plaintiff, the only measure of damages proved is the production of 8,253 barrels of oil of the value of eight thousand dollars, by Hue and Gerould under their lease from the defendant, and we are asked to give the plaintiff a judgment for the full value of this oil, without any allowance for the expense of its production, in the face of the notorious fact that Hue and Gerould received all of this oil, except a royalty of

Decision of Court below.

one eighth.    It should here be borne in mind that if the plaint-
iff had drilled and operated the mill-yard under his Brown-
Pratt lease, the defendant would have been entitled to one
fourth of the oil.    The plaintiff claims to recover the value of
all of this oil, on the theory that his seven wells would in time
have pumped, or as some of the witnesses expressed it, "sucked"
this oil out of the mill-yard lot.    [But the evidence offered to
sustain this suction or drainage theory was so vague and un-
certain that we are unable to find as a fact whether the plaint-
iff's wells would have drained or "sucked" one fourth, one
third, one half, or three fourths of this oil, if the Hue and Ger-
ould wells had not been drilled and operated.    From the evi-
dence adduced there is no doubt but that several other wells
drained or "sucked" oil from the plaintiff's lease to as great
an extent as did the Hue and Gerould wells.    In this view of
the case, even if trespass possibly might lie, we think common
justice requires that the plaintiff's rights be determined in the
equity suit.] [7]

[There is a second count in the plaintiff's statement, but we
recall no sufficient evidence, nor was it claimed at the argu-
ment that this count had been sustained.] [8]

We have been requested by the plaintiff's counsel to answer
the following points in writing :

1. By the terms of the lease of January 20, 1882, under
which the plaintiff held the demised premises, he was entitled
to the sole and exclusive right and privilege, during the period
of said lease, of digging and boring for oil and other minerals
on the demised premises, and removing the same ; and the
entry on the mill-yard and the drilling of oil wells thereon,
and the removal of the oil therefrom by Hue and Gerould, by
direction and authority of the defendant and under the lease
from him, without the consent of the plaintiff and against his
protest, was such a wrong and injury to the plaintiff as entitled
him to maintain this action.

Answer : Refused.[9]

2. The entry of Hue and Gerould, the lessees of the defend-
ant, was an entry by the defendant upon the plaintiff's premises,
and made the defendant liable in this action for the oil taken
from the wells drilled upon the mill-yard within the demised
premises ; and the plaintiff is entitled to recover in this action

a sum equal to the value of the oil as a chattel, at the time it was removed from the premises, with interest thereon.

Answer: Refused.[10]

The defendant's counsel has requested us to answer a large number of points in writing, but the view we take of the case makes it unnecessary to answer any but the last point, viz.:

That under all the evidence the plaintiff is not entitled to recover.

Answer: Affirmed.[11]

The prothonotary will give the proper notice of the filing of this decision to the parties or their attorneys; and, unless exceptions be filed within thirty days thereafter, judgment will be entered for the defendant.[12]

—To the foregoing decision, the plaintiff filed exceptions alleging inter alia that the court erred:

2–8. In the conclusions of law embraced in [ ] [2 to 8]

9, 10. In the answers to the plaintiff's points.[9 10]

11. In the answer to the defendant's point.[11]

12. In directing judgment for the defendant.[12]

13. In not directing judgment for the plaintiff for the damages proved under the first count of the plaintiff's statement.[13]

Said exceptions having been argued, the court, MORRISON, J., on March 18, 1891, filed an opinion dismissing all the exceptions and directing the prothonotary to enter judgment for the defendant. Thereupon, the plaintiff took this appeal, specifying that the court erred inter alia:

2–13. In not sustaining the plaintiff's exceptions.[2 to 13]

*Mr. C. Heydrick* and *Mr. Samuel T. Neill,* for the appellant:

Can the owner of a leasehold estate in the oil underlying the demised premises, with surface rights limited to certain definite locations,* maintain an action of trespass against the owner of the surface, for drilling wells at other points and taking out the oil therefrom?

1. By virtue of the legal title vested in him, the plaintiff had an estate in the " oil, gas and other minerals " underlying the entire demised premises, distinct from the surface: Caldwell

---

* " Location," in oil-country language, has become a technical term, meaning the place of an oil or gas well.

v. Fulton, 31 Pa. 475 ; Caldwell v. Copeland, 37 Pa. 427 ; Armstrong v. Caldwell, 53 Pa. 284; Chicago etc. O. & M. Co. v. Petroleum Co., 57 Pa. 83; Stoughton's App., 88 Pa. 198; Gowan v. Christie, L. R. 2 Scotch App. 273 (5 Eng. R. 114) ; Sanderson v. Scranton City, 105 Pa. 474; Brown v. Beecher, 120 Pa. 590 ; Addison on Torts, 259, § 392; Taylor on L. & T., § 773; Ashman v. Wigton, 20 W. N. 280; Wheeler v. Carpenter, 107 Pa. 271 ; Shiffer v. Broadhead, 126 Pa. 260 ; Dexter v. Lathrop, 136 Pa. 565; Boults v. Mitchell, 15 Pa. 380; Kissecker v. Monn, 36 Pa. 313.

2. The plaintiff, by means of his wells drilled into the underlying oil-bearing sand rock, had actual possession of his mineral estate in the demised premises. In the portions of the opinion of the court below constituting the third and fourth specifications of error, he has misapprehended the distinction between plaintiff's surface and mineral rights, as indicated in Duffield v. Hue, 129 Pa. 94, and Duffield v. Hue, 136 Pa. 602. It does not follow that because this court has determined in those cases that the plaintiff had no right of possession of the mill-yard for any purpose, he therefore could not maintain any action for damages caused to his oil under his Brown-Pratt lease. The question as to what constitutes actual possession of his estate, by a lessee under an oil or gas lease, was exhaustively considered in Westmoreland Gas Co. v. DeWitt, 130 Pa. 235, with the doctrine of which the conclusions of the court below referred to are altogether at variance.

3, 4. The defendant is liable for the entry by his lessees upon the mill-yard lot, to drill for oil. Plaintiff was in possession. Defendant put Hue and Gerould in possession, for the very purpose of taking out oil. He went with them upon the premises. Plaintiff went to him and objected. He pretended a forfeiture. The possession of his lessees was his possession. The law as to the liability of a lessor, under the circumstances, is clear: Dundas v. Muhlenberg, 35 Pa. 351; Doe v. Harlow, 12 Ad. & E. 40; McCloskey v. Powell, 123 Pa. 62; McCloskey v. Powell, 138 Pa. 383. And plaintiff's remedy against defendant was in trespass on the common-law side of the court, and not in equity. Jurisdiction in equity courts is preventive; for a completed trespass, which as a legal wrong is complete when protection is sought, they can give no redress whatever: 1 Pomeroy's Eq., § 178.

Arguments.

5, 6. The defendant is liable for the market value of all the oil taken, as a chattel, with interest to the date of judgment: Addison on Torts, 3d Eng. ed., 300, 301; Wild v. Holt, 9 M. & W. 672; Morgan v. Powell, 3 Q. B. 283; Lykens V. Coal Co. v. Dock, 62 Pa. 232; Allison's App., 77 Pa. 221. No wrongdoer can ask to have his liability measured by the benefit he received. The defendant was not an inadvertent trespasser; a bona-fide occupant is one who supposes that he has a good title and knows of no adverse claim: Morrison v. Robinson, 31 Pa. 456. And the "action of trespass," under the procedure act of May 25, 1887, P. L. 271, was the proper form of action. Whether before that act the action should be case or trespass, is immaterial: Stultz v. Dickey, 5 Binn. 285; Narehood v. Wilhelm, 69 Pa. 64; Shiffer v. Broadhead, 126 Pa. 260, 270.

*Mr. George A. Allen* (with him *Mr. W. E. Rice*), for the appellee:

1. This court, in the ejectment case of Duffield v. Hue, 129 Pa. 94, and in the equity suit between the same parties, 136 Pa. 602, adjudicated: (*a*) That the lease out of which this controversy arises must be treated as a lease for the production of oil, and not as a sale of the oil or of an interest in the land; (*b*) that an action of ejectment will not lie; (*c*) that by no construction of the contract in question can Pratt, or Duffield his assignee, be supposed to have had any possession or right of possession, for any purpose, in any part of the premises in dispute; (*d*) that equity is the proper remedy; (*e*) that trespass is not an adequate remedy; and (*f*) that the damages anticipated were incapable of measurement at law. It is impossible for the plaintiff's case to prevail, unless all the essential points so adjudicated are reversed.

2. It will not do for the plaintiff now to say that in the ejectment case, Duffield v. Hue, 129 Pa. 94, there was nothing but the surface in controversy, for in that case he was asserting his rights under the Brown-Pratt lease to the oil underlying the premises, as in the present case; and, this court having adjudicated that ejectment cannot be maintained upon the Brown-Pratt lease, the nature of the oil right must be held, as already adjudicated, adversely to the plaintiff. But why discuss the question of possession, when this court has already

decided that the plaintiff has neither possession nor right of possession in any part of the premises in dispute, for any purpose?

3. This court, in holding in Duffield v. Hue, 136 Pa. 602, that trespass is not an adequate remedy, must have had in mind trespass in its broadest meaning under the procedure act, which includes not only trespass quare clausum fregit, but trespass on the case,—in fact, all forms of trespass; and holding that the damages were of such character as could not be measured at law, was equivalent to holding that equity was the proper and exclusive remedy. But no action ex delicto of any kind can be maintained in this case. The defendant, who stood in Brown's shoes, had the undoubted right to have wells drilled on the mill-yard lot. If he had offered the privilege of drilling them to the plaintiff, who had refused it, he then could have drilled them himself. In other words, the right to drill them was a matter ex contractu, and no action ex delicto can arise out of the breach of a contract.

4. Equity is the proper remedy in this case: (*a*) Because this court has so decided in Duffield v. Hue, 136 Pa. 602. (*b*) Because the rules governing proceedings in equity will allow the defendant offsets for the expenses incurred in producing the oil, that are not permitted in actions ex delicto. (*c*) Because equity as a remedy is in its nature far more reaching, and better adapted to adjusting the rights and interests between parties to a controversy like this. (*d*) Because this court has held that the damages are incapable of measurement at law. Equity will give the plaintiff everything that belongs to him, if he has any cause at all; and will place him in the same position precisely as if the contract had been carried out according to its terms.

OPINION, MR. JUSTICE CLARK:

This controversy is now before us for the third time, each time in a different form. In order to a complete understanding of the questions already determined, and of the precise question for determination in this case, a brief statement of the facts is necessary. Some time prior to January 23, 1880, C. R. Elston executed a lease for general purposes of the surface of a certain tract of land in Clarendon, to Thomas and H.

W. Brown ; and on that day Elston's heirs executed a second lease to the Browns of a portion of the same land, for a term of twenty years, for the purpose of mining and operating for petroleum.   On January 20, 1882, the Browns made a lease of the exclusive right and privilege of digging and boring for oil or other minerals to F. M. Pratt, for fifteen years, covering that portion of the land embraced in the last-mentioned lease, but designating certain sites to which the operations for oil were to be restricted.   Pratt's interest subsequently became vested in C. C. Duffield, prior to the defendant's acquiring any interest in the property.   At the time of the execution of the lease from the Browns to Pratt, the Browns had upon the leased premises a saw-mill, connected with which was a yard for the storage of logs and lumber, the mill-yard occupying about two acres of land.   During the year 1882, and continuously since, paying producing oil wells have been in operation on the premises mentioned in the lease to Pratt.   The title of the Browns, subject to the Pratt lease, afterwards, by virtue of a sheriff's sale, became vested in Rosenzweig, who, on January 16, 1886, executed a lease for the two acres known as the mill-lot, for oil and mineral purposes, to Hue and Gerould. Six wells were put down by Pratt or his lessees before the sheriff's sale of June 8, 1885.   The seventh well was afterwards drilled, but none of these was on the land in controversy.   They were located, substantially, on the respective sites designated in the contract.   Several of the wells drilled by Pratt and his lessees were not drilled until after the time stipulated in the lease, but there was no claim or notice of forfeiture until February, 1886, when Rosenzweig gave notice that the said lessees' right to put down wells had ceased.   But whatever right the lessors may have had to insist on the forfeiture of the Pratt lease, by reason of the failure to put down the seventh well within the stipulated time, was waived by their previous acquiescence in the failure to put down within the time two or three of the preceding six wells; indeed, the seventh well would seem to have been put down with Rosenzweig's consent.

Hue and Gerould, soon after the date of their lease from Rosenzweig, and in pursuance thereof, went into possession of the mill-lot, and commenced operations.   Duffield thereupon,

Opinion of the Court.

on March 6, 1886, filed a bill in equity against them, setting forth his claim of a sole and exclusive right to the premises in dispute, for oil-producing purposes, under the lease from Pratt, and praying for an injunction and for an account for waste, and of the oil produced prior to final decree.   This bill was dismissed in the court below as an ejectment bill.   Whereupon, on July 18, 1888, Duffield brought an ejectment, which was determined in favor of the defendants ; the court being of opinion that the lease of January 20, 1882, gave only the particular sites specified in the lease, and that the lessors, or those claiming under them, had the right to operate for oil elsewhere on the lease, at their pleasure.   This case came to this court on a writ of error: Duffield v. Hue, 129 Pa. 94 ; and whilst the judgment was affirmed, our construction of the agreement was to a different effect.   In the opinion filed we said :

" Whilst by the printed form the leased premises are described as a ' certain lot or piece of land situate,' etc., it is plain from the written clauses that the premises were to be operated at certain designated points or sites only. . . . .   The rights of Pratt, as lessee for oil-mining purposes, are plainly restricted to these sites.   It is provided that he is to have the privilege of drilling other wells on the same premises, only in the event that the Browns might determine to have more wells drilled, and then the operations were to be conducted on the same terms. Whilst the lease, in some sense, may be said to cover the entire lot for oil-mining purposes, yet it is plain that operations were restricted to the sites mentioned.   Whatever oil might be produced from the premises leased, at those points, the lessees had a right to produce ; but they had no right of possession, for any purpose, at any other place within the bounds of the territory described.   If the lessors, or others acting under them, by boring other wells lessened this production, or otherwise disturbed or interfered with the rights of the lessees, they may have had their remedy, but not in this form ; for by no construction of the contract in question can Pratt be supposed to have had any right of possession, for any purpose, in any part of the premises in dispute ; and Duffield, in his right, has therefore no standing to recover in ejectment."

The plaintiff then entered an appeal in this court from the decree of the Common Pleas upon the bill in equity : Duffield

Opinion of the Court.

v. Hue, 136 Pa. 602 ; which, on October 6, 1890, resulted in a reversal of that decree, and the return of the record for further proceedings.   In the opinion we said, in substance, that, although the lessee, Duffield, had no right of possession such as would support an ejectment as to any land outside the sites designated for operation, he had the " protection " of the entire premises, and that equity had jurisdiction to restrain the lessor or others acting under him from drilling wells thereon, and from lessening thereby the production of the lessees' wells.   We said:

" The defendants, having taken possession of the mill-site for the purpose of boring for oil, could not be dispossessed by ejectment ; nor was trespass an adequate remedy.   It was, without doubt, proper for the plaintiff, if his claims are justified by the proofs, to resort to equity for redress.   The injury threatened was of a permanent nature, and destructive of his rights under the Pratt lease.   The damages anticipated were incapable of measurement at law.   The court below had, undoubtedly, jurisdiction for the prevention and restraint of the defendants, and for redress of the injuries suffered : Allison's App., 77 Pa. 221 ; Westmoreland Gas Co. v. DeWitt, 130 Pa. 235."

During the pendency of this appeal, however, the plaintiff, on November 21, 1889, brought this action of trespass, and proceeded to the trial thereof.   Although the trial would seem to have been completed in April, 1890, final judgment was not entered until March 18, 1891.

There can be no question, under our construction of the contract, as to the jurisdiction of equity ; any other remedy at the outset, was inadequate.   But the jurisdiction in equity does not oust the jurisdiction at law, inadequate as the latter remedy may be.   It may be that trespass, in its strict or technical sense, would not be the proper form of action.   The lease was of the exclusive right and privilege of operating for oil for the term of fifteen years.   It was for a definite term.   It was only a grant of the exclusive right " to operate for oil."   It was not a sale of the oil, and, as we said in Duffield v. Hue, 129 Pa. 94, it must be treated merely as a " lease for the production of oil, and not as a sale of the oil or of the land."   A lease of the mine, when for a definite term, implies the possibility of reversion ; that the mineral may be wholly exhausted before the expiration of the term is, in some instances, a possi-

ble, perhaps a probable result, but that does not affect the nature of the contract: Del. etc. R. Co. v. Sanderson, 109 Pa. 583; Lazarus's Estate, 145 Pa. 1. The plaintiff, therefore, did not own absolutely all the oil underlying this lot of land, nor had he possession of it. He was in possession of the land at the seven sites designated, subject to the royalty he stipulated to pay. He was entitled to all the oil he could produce at those sites; and, although limited in his actual operations, he had the protection of the entire premises, and the privilege of drilling other wells on the same terms, if the lessors should determine to have other wells drilled. But, except as stated, he was not in the actual possession of the land, nor, perhaps, of the oil beyond his actual production.

We are of opinion that perhaps an action of trespass, technically so called, could not have been maintained; but, by the act of May 25, 1887, P. L. 271, the distinctions theretofore existing between actions of trespass, trespass on the case, and trover, so far as they relate to procedure, were abolished; and, although the plaintiff's statement sets forth his claim as in trespass, we cannot, in view of the provisions of the statute, distinguish, in the form of procedure, one from the other. If the facts establish his right to recover in either form, therefore, he is entitled to judgment. In Union Pet. Co. v. Petroleum Co., 72 Pa. 173, the action was case for a disturbance of a similar right. The agreement there was to lease "the exclusive right and privilege of boring for oil," etc., which is the exact equivalent of the language employed in the lease now under consideration; and it was held that the right was in the nature of an incorporeal hereditament, but the lessee's possession was such only as was necessary to the exercise of the right, and that the proper remedy for the disturbance of it was an action on the case. The only assignment of error was that the plaintiffs could not recover in this form of action, unless they had shown to the satisfaction of the jury that they were in the actual possession of the premises upon which the disturbance was alleged to have occurred; but, said Mr. Justice SHARSWOOD, referring to this point in the opinion of the court, "no authority has been cited in support of it, and it is apprehended that none can be found. On the contrary, it is very clear, from the nature of the case, that possession of the land is not

Opinion of the Court.

necessary to enable the owner of an incorporeal hereditament to recover damages in this which is the only form of action to which he can resort. In general, he has no right to possession of any part of the land. . . . . In grants of right to bore for oil, there is, indeed, usually, as in this case, a right to possession of so much of the land as is necessary for the exercise of the privilege, but that, like the right of ingress and egress, is but an incident of the incorporeal hereditament. Possession of that might be, no doubt, gained or lost by ejectment, or enforced by trespass quare clausum fregit. To the latter action, actual or constructive possession is necessary in the plaintiff; but never to an action of trespass on the case, as in the common instance of a reversioner suing for a permanent injury to a freehold." If the plaintiff was entitled to the protection of the entire premises, excepting, perhaps, to the extent that they might be drained by the two wells existing at the time of the lease, and this, by the contemporaneous acts and practice of the parties, would seem to have been the meaning they assigned to the contract, then we are well satisfied that the plaintiff had a remedy at law, inadequate, perhaps, at the outset, for equity alone could restrain and prevent the unlawful acts of the defendants and assess the damages sustained or anticipated, nevertheless a remedy which they had a right to pursue, and that was an action of trespass under the statute; for, although there is complete jurisdiction in equity, that, as we have said, will not oust the jurisdiction, though inadequate, at law. The plaintiff, doubtful, perhaps, as to the result of the proceedings in equity, pursued his legal remedy, and we have now before us the record of this action of trespass.

But, assuming that an action of trespass is a proper remedy, and that the defendant invaded the territory of the plaintiff's protection to put down wells, and took out oil to the amount of 8,253 barrels, as the testimony appears to show, what should be the measure of the plaintiff's recovery? He should not be permitted to recover the price of all this oil, for the defendant was, in any event, entitled to a royalty out of it; and it does not appear, nor can it in any satisfactory way be made to appear, that the plaintiff would have been able, by any means within his power, to produce the whole, or any definite or certain portion of the oil at the sites to which he was restricted. We may

reasonably infer from the testimony of the oil operators, who have stated their knowledge of the Clarendon sand and their experience in this oil-field, that the invasion of the plaintiff's protection was an injury to the production of his wells, and that he is entitled to recover damages commensurate to the injury. But a large part of the testimony introduced upon this subject, it must be conceded, was of the most unsatisfactory character. It was to a great degree fanciful, conjectural, and speculative. The witnesses were asked to state, from their experience as oil operators, and their knowledge of the Clarendon sand, from the location of the plaintiff's wells around the mill-yard, and the location of the wells of the defendant, what proportion of the oil produced by those three wells, during the term of the lease from Browns to Pratt, would be taken or could have been taken out through the plaintiff's wells. The opinions of the witnesses on this subject, as might be expected, varied greatly. The estimates ranged from one third to seven eighths of the production of the three wells. The testimony shows that the subject is one as to which there is great diversity of opinion. Operators have widely different ideas. Some of the witnesses, although stating their opinions, say it is impossible for anybody to make any definite estimate. It is plain, from a careful reading of the evidence, that the estimates made were mere guesses. Besides, if the theory advanced as to the extent of the drainage of the plaintiff's wells is pursued, how is it possible to determine the effect of the wells on 498, of the two Brown wells on 497, and of other wells on contiguous or adjacent properties? It is impossible, we think, to make any estimate of the plaintiff's damages upon this basis which would be even approximately correct. Assuming that this would ordinarily be the proper measure of damages, we are obliged to resort to some other, for, in the very nature of the case, proof upon this basis of assessment is wholly impracticable, indeed impossible.

A party is not confined to a single mode of measuring or estimating his damages. When the case admits of it, he may resort to different means of arriving at a proper result of the amount of loss sustained in consequence of the injury: Rogers v. Bemus, 69 Pa. 432. As a general rule, where it is practicable or the extent of the wrong may be apportioned from time

Opinion of the Court.

to time, the plaintiff is entitled to damages to the commencement of the suit, and successive actions may be brought as long as the wrongful conditions continue or the obstruction is maintained: Bare v. Hoffman, 79 Pa. 71.   But, where the extent of the wrong is not thus apportionable, or the injury is of a permanent character, the damages may be assessed in a single action : Seely v. Alden, 61 Pa. 302; 5 Am. & Eng. Enc. Law, 17. In this case, the defendant drilled three wells within the protected territory, and the gas which operated the plaintiff's flowing wells was thereby allowed to escape.   The constructions and operations of the defendant's lessees were of a permanent character, and their entry was for a permanent use and employment.   The extent of the injury inflicted upon the plaintiff, in the very nature of the case, is not apportionable from time to time, and we are of opinion that the entire damage, ex necessitate rei, must be assessed in this action.*   Plaintiff's title is a leasehold, and the proper measure of damages for which the defendant is liable is the difference in the value of the leasehold until the expiration of the term, free from the obstructions which the defendant's lessees have put upon it, less the value as affected by these obstructions : Pittsb. etc. R. Co. v. Jones, 111 Pa. 204.

There is some testimony bearing upon the depreciation in value of the plaintiff's lease, by reason of the drilling and operation of the three wells of the defendant's lessees.   Perhaps it is not full enough to justify an intelligent estimate upon that basis; but, as the plaintiff would seem to be entitled to judgment for some amount,

> The judgment is reversed, and the record remitted for further proceedings.

---

* " When the thing has but one neck, and that is cut off by one act of the defendant, it would be mischievous to drive the plaintiff to a second, third, or fourth action, as the successive consequences of the wrong may arise : "   Mr. Chief Justice BLACK, in Miller v. Wilson, 24 Pa. 114.—REP.