# Bricker *v.* Conemaugh Stone Company, Appellant.

*Waters—Milldam—Lower riparian owner—Quarry—Sediment in milldam—Damages.*

In an action by the owner of a milldam, against the owner of a quarry on a stream above the milldam, to recover for injuries to the latter by reason of the residuum of the defendant's stone quarrying operations settling in the milldam, the case is for the jury where there is voluminous testimony to the effect that the sediment found in the milldam was the same as the residuum of the quarry, and that the settling of such sediment required at times the entire stoppage of the mill.

In such a case it is error for the court to charge generally that the measure of damages was the loss of profits where there is evidence of the gross receipts for previous years, but no evidence whatever of the cost of repairs, insurance, taxes and other expenses incidental to the operation of the mill.

The damages are twofold: First, the cost of removing the deposits occasioned by the acts of the defendant from the dam and race of the plaintiffs; and, second, the compensation for the total or partial loss of the use and enjoyment of the premises in the meantime, or in other words, the difference in rental value of the property, as affected by the injury complained of.

Argued May 14, 1906.  Appeal, No. 71, April T., 1906, by defendant, from judgment of C. P. Armstrong Co., June T., 1904, No. 167, on verdict for plaintiff in case of H. A. Bricker, T. M. Bricker and D. J. Beckett, trading as Bricker & Beckett Bros., v. Conemaugh Stone Company.  Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ.  Reversed.

Trespass to recover damages for injuries to a milldam.  Before PATTON, P. J.

The court charged in part as follows:
[I will explain the law of the case to you and will endeavor to make it as clear as I can.  The law is, that the Conemaugh Stone Company has a right to wash its sand on its own premises.  But the law requires it to keep its refuse upon its own land, so that it will not wash down into this stream, unless it should be carried away by an extraordinary flood.  If the Conemaugh Stone Company allows this sand and refuse to be washed into Todd's run, and from there into Buffalo creek and by ordinary floods it is carried down the creek and does damage to the plaintiff's gristmill, then it is liable for damages to an amount which we will hereafter explain.  But if this stone company deposits this refuse upon its own land, and it is carried away by extraordinary floods, or by what is known in legal parlance as an act of God, then it would not be liable.  But, as I said before, if it allowed this refuse to find its way into Buffalo creek, where it could be carried away by ordinary floods, and this sand and refuse afterwards did damage to, what is known in the law, as the lower riparian owners, then the defendant would be liable for damages to the amount which we will explain to you.]  [8]
[The measure of damages would be the cost of cleaning out the plaintiff's dam and mill race, and of keeping them cleaned

of the sand and refuse from the defendant's sand plant, from the spring of 1902, until March 3, 1904, to the extent that the water power of the plaintiffs would not be diminished; to which should be added the loss of custom sustained by the plaintiffs, while their mill was shut down during the removal of this sand and sediment, if the jury find that there was any loss of custom. If, however, the jury should find that the keeping of the dam and the race in repair, as we have explained, exceeds the loss of profits, then the loss of profits is the true measure of the damages. And, if the jury should find that from December, 1903, to March 3, 1904, sand from the defendant's plant came into the plaintiff's mill race, so often that it could not be removed, and compelled the plaintiffs to close down their mill between these two dates, the measure of damages would be the loss of the profits.

Gentlemen of the jury, I will try to make that plain to you. The plaintiffs, if they are entitled to damages, in the first place, would be entitled to what it would cost them to keep this mill race in repair, so that their water power would not be diminished. A number of witnesses have been called in regard to that. Mr. Bricker testifies that he cleaned this out at least fifty times. That his son cleaned it out and Mr. Hawley helped, and that the wages he paid were $2.00 per day, and that Thorne worked two or three different days. Mr. Thorne testifies that all told, he got paid for a day and a half at $2.00 a day, which would be $3.00. Harry Bricker testifies that he cleaned it out at least from twenty-five to fifty times. Thomas Hawley testifies that he worked one and one-half or two hours shoveling out the wheel.

Now, gentlemen, if you find that this race could have been kept in repair, by men working there and keeping this sand out, then that would be the true measure of damages. As we have said to you, Mr. Bricker testifies that he cleaned it out some fifty times; Thorne testifies that he got $3.00 for what he did. Harry Bricker, a son of Mr. Bricker, a plaintiff, was a young man and he said he did not get any particular pay, that he was working for his father, but he would be entitled to what his labor was reasonably worth. Holly says he worked one and a half or two hours. Now if the jury believe that that race could have been kept in repair, that would be the measure of damages,

to which should be added the loss of custom while they were engaged in cleaning out this mill race.

The testimony seems to be, that some farmers came there with their grist, whatever it was, and could not get it ground on account of this race being cleaned out.    Squire W. A. Jack testifies that he came there with sixty bushels of corn and could not get it ground on account of the mill being shut down and he had to go away.    Levi Wilson testifies that he went there with 300 bushels of corn.    William Morrison went there with forty-four bushels of corn.    J. D. Drake, but the amount is not given, and I think two other parties went there, and could not get their corn ground.

The testimony shows that corn, at that time, was worth fifty-six cents a bushel, and I believe the testimony shows that the miller got one-third toll for grinding.    That testimony would enable the jury to arrive at something like just compensation, but of course, in this matter, we cannot reach anything like mathematical certainty.    The best you can do is to reach the question and the amount as near as you can.

The testimony also seems to show that during a certain time, if you believe the testimony on the part of the plaintiffs, this refuse and sand got so bad that they could not keep it out.    I think one witness says that he cleaned it out in the afternoon and the next morning it was as bad as ever, and they were shut down.    Now that was in December, 1903, and they were kept closed down until March, 1904, so that if you believe that this sand compelled the plaintiffs to close down their mill entirely, then they would be entitled to recover for the loss of profits. In arriving at that, one of the plaintiffs testified to certain amounts, which at first I understood to be his net profits, but I take it now, that that was the gross profits; however, that is a question I submit to the jury to determine.    He testified, if I understand it now, but that is for the jury, that in November, and in December, 1896, these gross profits amounted in all to $115. In 1897, $1,143.93.    In 1898, $614.44.    In 1899, $671.01. In 1900, $713.02.    In 1901, $238.11.    In 1902, $210.59.    In 1903, $77.91, and in 1904, nothing.    Now, then, the jury will notice from these figures, that in 1897, there must have been a prosperous year.    For some reason they appear to have taken in in the neighborhood of $1,200.    In other years, including 1900,

they appear to have taken in about $600, or nearly $700 a year. From 1901 to 1902, their profits fell off. In 1901, they were $238. As I recollect the testimony, there was no complaint of this sand mill in 1901. In 1902 their income was $201.

Now, gentlemen of the jury, that gives you some data from which to figure what would be the loss of their profits. If those figures show gross profits, then from that should be taken what went to the miller, and the cost of repairs, and insurance and taxes and anything else in the nature of expense, so that you could arrive at what the net profits would be, because it would be only the loss of the net profits, that the plaintiffs would be entitled to recover.] [9]

Verdict and judgment for plaintiff for $209.25. Defendant appealed.

*Errors assigned* among others were (8, 9) above instructions, quoting them.

*John E. Kunkle* and *E. O. Golden*, with them *D. B. Heiner* and *Edward E. Robbins*, for appellant.—Every man has a right to the natural use and enjoyment of his own property and if while lawful in such use, and enjoyment without malice or negligence on his part, unavoidable loss occurs to his neighbor, it is damnum absque injuria, for the rightful use of one's own land may cause damage to another, without any legal wrong : Penna. Coal Co. v. Sanderson, 113 Pa. 126 ; Penna. R. R. Co. v. Marchant, 119 Pa. 541; Hauck v. Pipe Line Co., 153 Pa. 366 ; Collins v. Chartiers Valley Gas Co., 139 Pa. 111 ; Panton v. Holland, 17 Johns. 92 ; Harvey v. Coal Co., 201 Pa. 63.

There has been no testimony to show how much of the deposit in this milldam and headrace was due to the defendant, and that cannot be left to the conjecture of the jury: Robb v. Carnegie Bros. & Co., 145 Pa. 324 ; Keiser v. Gas Co., 143 Pa. 276 ; Fischer v. Sanford, 12 Pa. Superior Ct. 435 ; Hutchinson v. Snider, 137 Pa. 1 ; Sedgwick on Damages, sec. 177 ; Duffield v. Rosenzweig, 144 Pa. 520.

On the question of the measure of damages, we are satisfied that the court erred: McNeil & Bros. Co. v. Crucible Steel Co., 207 Pa. 493 ; Becker v. R. R. Co., 177 Pa. 252 ; Clark v. R. R. Co., 145 Pa. 438 ; Rogers v. Bemus, 69 Pa. 432 ; Fleming v.

Beck, 48 Pa. 309; McConaghy v. Pemberton, 168 Pa. 121; Bachert v. Lehigh Coal, etc., Co., 208 Pa. 362.

*W. J. Christy* with him *James H. McCain*, for appellee.—The ground of action is not the depositing the sediment in the dam, but the wanton and reckless act above : Little Schuylkill Navigation, etc., Co. v. Richards, 57 Pa. 142 ; Long v. Trexler, 8 Atl. Repr. 620 ; Penna. Coal Co. v. Sanderson, 113 Pa. 126; Hindson v. Markle, 171 Pa. 138 ; Elder v. Lykens Valley Coal Co., 157 Pa. 490.

The true measure of damages was the cost of removing the obstruction in so far as it interfered with the power furnished plaintiffs' mill, and the loss of the use of the mill property.

In the case : Hoffman v. Mill Creek Coal Co., 16 Pa. Superior Ct. 631 ; Horton v. Hall, 1 Penny. 159.

OPINION BY BEAVER, J., February 25, 1907 :

The voluminous record which we have here, in the analysis of the numerous assignments of error made by the appellant, presents but two questions.

The first is one of fact the appellant arguing, however, that there was not sufficient evidence upon which the jury could find the essential fact which underlies its verdict.   This fact, succinctly stated, was, did the residuum of the defendant's quarrying and stone crushing operations, cast into the stream upon which its works were situated, constitute or contribute to the sediment which settled in the mill dam of the plaintiffs lower down the stream and render their mill, which depended upon the stream for power, less valuable, requiring at times the entire stoppage of the mill, in order to remove the sediment from their race, and the dam which fed it?

There are some facts of universal human experience, founded upon natural law, which can scarcely be disputed.   One is that water will run downhill ; another is that substances heavier than water will sink to the bottom, and yet another, that substances cast into a stream, even although heavier than water, will be carried downstream, if the volume and velocity of the stream exceed in momentum the resisting power of the deposit.

The appellant would seem to argue against these apparently self-evident facts, in attempting to convince us that the jury

was wrong in finding that the defendant at least contributed to the injury which was undoubtedly suffered by the plaintiffs.

The testimony as to the injury was practically undisputed. Whether or not the defendant contributed to it was fairly left to the jury, upon abundant evidence. Samples of the sediment, which settled in the plaintiffs' mill dam and race, were brought into court and the testimony of witnesses, tending to connect the residuum created by the operations of the defendant and this material, taken at considerable length. There was more or less of dispute in regard to this question, depending upon the color and character of the deposit, but a consideration of the testimony leaves us in no doubt as to the necessity of submission of it to the jury. The court did this in a very plain and impartial manner. The jury could not be in doubt as to what their duty was. The testimony was impartially weighed and fairly submitted. With the verdict of the jury, rendered under such circumstances, we have no right to interfere, and would have no disposition to do so in this case, even if we had such a right.

The second question is one of law: Did the court properly instruct the jury as to the measure of damages?

Under the facts, as developed in this case, the damages were evidently two-fold: First, the cost of removing the deposits occasioned by the acts of the defendant from the dam and race of the plaintiffs, and, second, the compensation for the total or partial loss of the use and enjoyment of the premises in the meantime, or in other words, the difference in rental value of the property, as affected by the injury complained of. There was no evidence, and apparently no claim, that the cost of the removal of the deposits and the restoration of the property to its former condition would be greater than the injury from those deposits if allowed to remain. In that case, the true measure of damages would have been the difference between the market value of the land before and after the deposits were made. But, before the latter measure of damages may be invoked, it is incumbent on the person injured to give evidence from which a jury may conclude with some degree of certainty that the former measure will not fully compensate him for the injuries: Hoffman v. Mill Creek Coal Co., 16 Pa. Superior Ct. 631; Elder v. Lykens Valley Coal Co., 157 Pa.

490; Stevenson v. Ebervale Coal Co., 201 Pa. 112; 203 Pa. 316; Bachert v. Lehigh Coal & Nav. Co., 208 Pa. 362.

The instructions of the court upon this subject, as complained of by the defendant in the ninth assignment of error, were, in general, that the measure of damages was the loss of profits of the business of the plaintiffs. If these instructions had been confined to the actual loss of custom which could have been definitely measured, such as the turning away of persons with particular loads of grain which plaintiffs were unable to grind, because of the stoppage of the mill, occasioned by the cleaning out of the dam and the race, this might have been regarded as outside the realm of speculation at least, and might have been some evidence of the loss of rental value. The court, however, goes much farther and says: "If, however, the jury should find that the keeping of the dam and the race in repair, as we have explained, exceeds the loss of profits, then the loss of profits is the true measure of the damages. And, if the jury should find that, from the December of 1903 to March the 3d, of 1904, sand from the defendant's plant came into the plaintiffs' millrace so often that it could not be removed and compelled the plaintiffs to close down their mill between these two dates, the measure of damages would be the loss of the profits."

This we think was erroneous. It was not only contrary to the well settled rule to which we have previously alluded, but introduced a measure of damages speculative and incapable of definite ascertainment. Compensation and not speculation is the invariable rule. Our Pennsylvania cases are those under contract, but, as stated in Sedgwick on Damages sec. 175: "The early cases, in both the English and American courts, generally concurred in denying profits as any part of the damages to be compensated, and that, whether in cases of contract or of tort." This rule has been followed very closely in Pennsylvania: Fleming v. Beck, 48 Pa. 309; Rogers v. Bemus, 69 Pa. 432; McConaghy v. Pemberton, 168 Pa. 121, in which in the report of the master at page 132 the whole question is carefully considered: Duffield v. Rosenzweig, 144 Pa. 520.

Not only did the court lay down an erroneous rule as to the measure of damages, but submitted to the jury a mode of ascertaining profits which was indefinite and unreliable. After

reciting the figures given by one of the plaintiffs, as the gross receipts from the mill for previous years, the court said:

" Now, gentlemen of the jury, that gives you some data from which to figure what would be the loss of their profits. If those figures show gross profits, then from that should be taken what went to the miller, and the cost of repairs and insurance and taxes, and anything else in the nature of expense, so that you could arrive at what the net profits would be, because it would be only the loss of the net profits that the plaintiffs would be entitled to recover."

There was no evidence, however, as to these several items which the court said should be deducted which would enable the jury to reach a definite conclusion. The plaintiff, who testified as to the receipts, admitted that he was unable to say what the taxes had been, and there does not seem to have been anything said as to the insurance and the other items concerning which the court intimated deduction should be made.

The appellant cites, and attempts to rely upon, the well-known case of Penna. Coal Co. v. Sanderson, 113 Pa. 126, as an absolute bar to recovery. This case is exceptional and rests entirely upon its own facts, and has been distinguished, by the court which rendered it, from cases such as this in Hindson v. Markle, 171 Pa. 138. As said in that case: " The case of Penna. Coal Co. v. Sanderson, 113 Pa. 126, is not at all in point. That was the mere flowage of natural water which was discharged by natural and irresistible forces, necessarily developed in the act of mining, prosecuted in a perfectly lawful manner. While the mine water thus discharged polluted the water of the stream in which it necessarily flowed, it caused no deposit of any foreign substance on the land of the plaintiff and did not deprive her of its use." The conditions here were similar to those in Hindson v. Markle, so that the Sanderson case has no application.

We have not followed the assignments of error in their order, nor have we thought it necessary to deal with them separately. The real questions in the case, however, have been, we think, sufficiently covered by what has been said, and the true measure of damages indicated, so as to avoid the error complained of, in a retrial.

Judgment reversed and a new venire awarded.